**In re RAINBOW MAGAZINE, INC., Debtor.**

**Craig E. CALDWELL, Appellant,**

v.

**UNIFIED CAPITAL CORP., Appellee.**

**No. 94–55634.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 18, 1995.

Decided Feb. 20, 1996.

Craig E. Caldwell, pro. per., Long Beach, California; Clinton L. Hubbard, Fischer, Brown, Huddleson & ·Gunn, Fort Collins, Colorado, for appellant.

Maria K. Pum and Jeffrey Garfinkle, Brobeck, Phleger & Harrison, San Diego, California, for appellee.

Before: HUG and LEAVY, Circuit Judges, and MUECKE,* District Judge.

Opinion by Judge HUG.

HUG, Circuit Judge:

This case requires us to define the authority of a bankruptcy court to sanction an individual that is not a party, an attorney, or a signatory to any documents filed before the court. Craig Caldwell appeals the district court's order affirming the bankruptcy court's sanctions against him in the Chapter 11 bankruptcy proceedings of debtor Rainbow Magazine, Inc. The Bankruptcy Appellate Panel ("BAP") reversed a prior award of sanctions against Caldwell noting that he could not be sanctioned under the bankruptcy court's inherent power. The BAP remanded for further consideration of possible

sanctions against Caldwell for signing an inaccurate Statement of Affairs for Rainbow Magazine under Bankruptcy Rule 9011. On remand, the bankruptcy court imposed sanctions under Rule 9011 for the inaccurate statement and also resanctioned Caldwell under the court's inherent powers. Caldwell asserts that the sanctions are against the ruling of the BAP, exceed the authority of the bankruptcy court, and are not supported by the facts.

## FACTS

Caldwell does not dispute the facts as presented by the bankruptcy court in its unpublished memorandum which are as follows:

On March 15, 1989, the Debtor petitioned the bankruptcy court of the Central District of California for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* In an apparent attempt to manipulate the jurisdiction of the local courts, the Debtor filed a misleading and inaccurate petition. Instead of identifying its long-time headquarters in Long Beach (Los Angeles County) on the petition, the Debtor listed its address as that of the legal offices of Caldwell's personal attorney in Orange County. Furthermore, the Debtor filed a false Local Rule 104 statement which failed to disclose a related proceeding pending in San Bernadino or Riverside County, *In re One Quail Place,* Case No. SB 87–06972. These actions produced the initial assignment of the Debtor's case to a bankruptcy judge sitting in Orange County, a "home court" advantage for the 10–50 Chapter 11 case veteran Caldwell.

On the petition date the primary asset of the Debtor was a 384 unit apartment complex located in Palm Desert, California ("the property"). The Debtor had acquired the property merely three weeks earlier at a foreclosure sale held on February 24, 1989. Before and after the sale, the property was encumbered by a first deed of trust in favor of Unified Capital

* Honorable C.A. Muecke, Senior United States District Judge, District of Arizona, sitting by designation.

Corporation ("UCC") that secured a debt of $17,000,000. Prior to foreclosure, the property had been encumbered by a second deed of trust in favor of Gibraltar Federal Savings and Loan Association ("Gibraltar") securing a debt of $2,000,000.

Originally, an entity called One Quail Place ("OQP"), a limited partnership controlled by Dennis Martin, owned the property. That entity filed for Chapter 11 protection in October of 1987 and the case was converted to Chapter 7 one year later. Both UCC and Gibraltar requested relief from the automatic stay in the OQP bankruptcy. Gibraltar obtained relief in August of 1988 and scheduled the foreclosure sale for February 24, 1989. Two days prior to this sale, Caldwell arranged a purchase of Gibraltar's interest, under the deed of trust and note, in the property. For a price of $250,000 Gibraltar sold its interest in the apartment complex, certain personal property located on the premises, and a personal guarantee of Gibraltar's note which Gibraltar had obtained from Martin.

Caldwell decided to cause the Debtor—one of his many corporate entities—to make the purchase from Gibraltar. Thus, on February 22, 1989, the Debtor obtained Gibraltar's interest in the real property, the personal property and Martin's personal guarantee. At the foreclosure sale Caldwell caused the Debtor to credit bid in the amount of $2,000,000. As a result, the Debtor obtained title to the property and recorded a deed on February 28, 1989.

Meanwhile, UCC obtained relief from the automatic stay in November of 1988 in the OQP case and commenced litigation in state court to obtain, *inter alia,* appointment of a receiver. The receiver was appointed on March 14, 1989, only to be displaced the following day when the Debtor filed for bankruptcy.

This court concluded ... that the Debtor filed for bankruptcy in bad faith. The Debtor's petition represented an elaborate effort by Caldwell and Martin, Caldwell's occasional partner and confederate, to frustrate UCC's collection efforts and misuse UCC funds. Specifically, the evidence showed that Martin—who had been retained by the Chapter 7 trustee in the OQP bankruptcy to manage the apartment complex and collect rents—diverted $180,000 out of the OQP bankruptcy estate in direct violation of the instructions of the trustee. Since UCC had perfected its interest in those rents, UCC had a direct interest in the $180,000 Martin misappropriated. Adding insult to injury, Martin then made these funds available to Caldwell and his entity the Debtor, who used the amount to purchase Gibraltar's interest. Following foreclosure, Caldwell then arranged to have the Debtor retain Martin's management company as the managing agent of the property. Thus, the series of actions by Martin and Caldwell had the effect of displacing both the OQP Chapter 7 trustee and the state court receiver while leaving Martin and Caldwell in control of the property and its rental income, a classic case of "apartment house hijacking." The fact that UCC funds were used to finance the entire transaction only made the bad faith filing of the Debtor all the more egregious. Unfortunately, the abuse of bankruptcy law did not end there.

After the foreclosure sale and prior to the Debtor filing for bankruptcy, Caldwell had the Debtor transfer to him personally Martin's guarantee of the note. He also induced the Debtor to transfer the personal property acquired from Gibraltar to another of Caldwell's corporate entities, C & W Imports, Inc. These transfers were essentially undocumented and without consideration. Caldwell then forced the Debtor to lease the personal property (worth $600,000 according to his testimony) from C & W Imports for $10,750 per month. Furthermore, once the Debtor obtained the apartment complex and access to its rents, Caldwell proceeded to pay himself $157,250 in "Compensation, consulting fees" and "loan payment[s]" immediately pre-petition.

Following the bankruptcy petition, UCC again properly perfected its interest in the rents of the apartment complex thereby converting all of the Debtor's funds into "cash collateral" within the meaning of 11 U.S.C. § 363. But despite that statute's

clear prohibition against using cash collateral without court approval or the consent of the secured creditor, Caldwell caused the Debtor to pay his related companies nearly $45,000 in managing fees or rent. At one point, UCC demanded that the Debtor terminate employment of Martin and his managing company. Caldwell responded by replacing Martin with another entity owned by Caldwell.

Approximately three and a half months after filing the petition, UCC succeeded in wresting control of the property away from Caldwell by securing appointment of a Chapter 11 trustee. Nevertheless, Caldwell managed to deplete all the cash collected by the Debtor while under Caldwell's control—nearly one-half million dollars in rent. These expenditures were without court approval and beyond any consent by UCC.

*In re Rainbow Magazine, Inc.*, No. SB 87–04627–DN, at 2–6 (Bankr.C.D.Ca. Feb. 11, 1993) (footnotes omitted). Even though Caldwell orchestrated the bad faith filing of the bankruptcy petition, Caldwell only signed one document presented to the court—a Statement of Affairs.

Based upon these facts, the bankruptcy court sanctioned Rainbow and Caldwell, jointly and severally, in the amount of $261,000 for the bad faith filing on August 21, 1990. Caldwell and Rainbow appealed to the BAP. *See In re Rainbow Magazine, Inc. (Caldwell v. Farris)*, 136 B.R. 545 (9th Cir. BAP 1992). On February 13, 1992, the BAP affirmed the sanctions against Rainbow. However, the sanctions against Caldwell were reversed. The court determined that a nonparty, nonattorney, and nonsignatory could not be sanctioned by the bankruptcy court regardless of the egregiousness of their actions. *Id.* at 554. However, the court remanded for a determination of the appropriateness of sanctions against Caldwell for the false filing of a Statement of Affairs. We declined to review the BAP ruling due to the interlocutory nature of the remand.

On February 11, 1993, the bankruptcy court issued a new decision resanctioning Caldwell. First, the court sanctioned Caldwell $45,000 for the false filing of the State-ment of Affairs. Then the court sanctioned Caldwell $249,389.31 under its inherent powers for orchestrating Rainbow's bad-faith bankruptcy. The court reasoned that the intervening decision in *Lockary v. Kayfetz*, 974 F.2d 1166 (9th Cir.1992), *cert. denied sub nom. Pacific Legal Foundation v. Kayfetz*, 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993), allowed for sanctions against Caldwell. On June 2, 1993, UCC filed an objection to the referral of the appeal to the BAP. Therefore the appeal came before the district court which affirmed the award on April 5, 1994.

## DISCUSSION

On appeal, Caldwell asserts that the bankruptcy court violated the law of the case doctrine by assessing sanctions against him in violation of the plain language of the BAP remand. Caldwell also asserts that the $45,000 in sanctions under Rule 9011 are not factually supported by the record. Finally, Caldwell contends that the $249,389.31 sanction was improper because bankruptcy courts have no inherent power to sanction. We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.

## I. THE LAW OF THE CASE DOCTRINE

■ Caldwell asserts that the award of sanctions against him for Rainbow's bad faith filing ignores the ruling of the BAP. He argues that the sanctions violate the law of the case doctrine as well as the plain language of the mandate. We disagree.

"The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir.1993) (quoting *Maag v. Wessler*, 993 F.2d 718, 720 n. 2 (9th Cir.1993)). Although the observance of the doctrine is considered discretionary, this court has ruled that the prior decision should be followed unless:

(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.

*Hegler v. Borg,* 50 F.3d 1472, 1475 (9th Cir. 1995). The bankruptcy court held that the law of the case doctrine did not apply because of the second exception. We agree.

The BAP ruled that Caldwell could not be sanctioned under the bankruptcy court's inherent powers. *Rainbow Magazine,* 136 B.R. at 554. Although the BAP acknowledged that failing to sanction Caldwell would be unjust, the court determined that no authority existed for sanctioning a person that was neither a signatory, an attorney, nor a party. *Id.* Therefore, the court reversed the sanctions.

On remand, the bankruptcy court held that there was subsequent controlling authority in *Lockary v. Kayfetz,* 974 F.2d 1166 (9th Cir. 1992), *cert. denied sub nom. Pacific Legal Foundation v. Kayfetz,* 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993), which allowed for the sanctioning of Caldwell. In *Lockary,* this court affirmed sanctions awarded against the Pacific Legal Foundation ("PLF"), a nonprofit corporation that represented landowners, for orchestrating a frivolous lawsuit. The district court had determined that none of the individual plaintiffs or the attorneys had been involved in the wrongdoing. Therefore, "[t]he district court imposed sanctions on PLF, the entity which had controlled the litigation ... and was, in the court's view, responsible for the substantial abuse of the court system." *Id.* at 1169. Although such a sanction was not possible under Rule 11 (because PLF was neither an attorney, a party, or a signatory), we determined that it was a proper exercise of the court's inherent powers to sanction PLF. *Id.* at 1170.

Caldwell argues that *Lockary* was not really a change in the law that would justify a departure from the law of the case. However, the plain language of *Lockary* directly affects the BAP's analysis. The BAP reasoned:

> Neither *Chambers* nor the other cases cited by the parties involved the use of

this inherent power as a basis to sanction an entity who is neither a party nor an attorney. Similarly, our research failed to uncover any such case.... Given the absence of authority supporting the imposition of sanctions against a non-party and the fact that the inherent power to impose sanctions for bad faith conduct must be exercised with restraint and discretion, ... we decline to uphold the bankruptcy court's imposition of sanctions against Caldwell under any inherent power.

*Rainbow Magazine,* 136 B.R. at 553 (citation omitted). Thus, our opinion in *Lockary* provided support for the exact proposition that the BAP was seeking—we allowed sanctions to be imposed against a nonparty and nonattorney under the court's inherent powers. *See also Corder v. Howard Johnson & Co.,* 53 F.3d 225, 232 (9th Cir.1995) (holding that courts may impose sanctions against a nonparty "to curb abusive litigation practices"). Thus, it is not appropriate to apply the law of the case in this situation.

That conclusion is particularly pertinent in this case because the interlocutory ruling by the BAP had not yet received review by this court. It would be a convoluted procedure not to allow the bankruptcy court to apply subsequent controlling precedent of this circuit in such a circumstance.

## II. THE SANCTIONS UNDER RULE 9011

 Caldwell next contends that irrespective of the law of the case doctrine, the bankruptcy court improperly sanctioned him. Caldwell was sanctioned $45,000 under Rule 9011 for signing a false Statement of Affairs and $249,389.31 under the court's inherent powers for orchestrating Rainbow's bad-faith bankruptcy. Bankruptcy courts' power to sanction derives from Bankruptcy Rule 9011. Rule 9011 allows a bankruptcy court to sanction attorneys, parties, and individuals that file bad-faith documents before the court.[1]

---

1. Rule 9011 states:

Every petition, pleading, motion, and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, except a list, schedule, or one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or a party constitutes a certificate that the attorney of party has

There is no dispute between the parties that Caldwell signed a Statement of Affairs that did not list several transfers of property. However, Caldwell contends that the paper was immaterial because the appellee already knew about the transfer. We review an award of sanctions under an abuse of discretion standard. *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 291 (9th Cir.1995).

The bankruptcy court considered Caldwell's argument that no harm came of his false filing. The court found that he did not disclose the disputed transactions during his three depositions, and that the appellee spent many hours as a result of the false Statement of Affairs attempting to determine where the assets of Rainbow were. We conclude that the opinion of the bankruptcy court is soundly based on an examination of the transcripts of Caldwell's deposition. Although Caldwell did mention in his third deposition that he owned one of the missing guarantees, the court found that the one-line admission did not set the record straight. Under the circumstances of this case, we conclude that the bankruptcy court's imposition of this sanction was not an abuse of discretion.

## III. A BANKRUPTCY COURT'S INHERENT POWER TO SANCTION

■ In addition to the Rule 9011 sanction, Caldwell challenges the $249,389.31 sanction under the bankruptcy court's inherent powers. Because the only conduct by Caldwell that can be sanctioned under Rule 9011 is the filing of the false Statement of Affairs, Caldwell argues that he cannot be further sanctioned because bankruptcy courts do not have any inherent powers to sanction beyond Rule 9011.

The subject of inherent authority to sanction was recently addressed by the Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). In *Chambers*, the Supreme Court held that federal district courts possess the inherent power to sanction bad-faith conduct in litigation when that conduct falls outside the scope of Federal Rule of Civil Procedure 11 or 28 U.S.C. § 1927. In *Chambers*, a party engaged in several years of vexatious litigation tactics in an effort to thwart the jurisdiction of the court. The district court sanctioned the defendant approximately $1 million. In affirming, the Supreme Court stated:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

*Id.* at 43, 111 S.Ct. at 2132 (citations omitted). Thus, *Chambers* acknowledges district courts' inherent power to sanction through their status as a court of justice.

■ Caldwell argues, however, that *Chambers* only applies to Article III courts and that bankruptcy courts do not have such inherent authority. Bankruptcy courts are not created under the authority of Article III of the Constitution. Instead, bankruptcy

read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission

is called to the attention of the person whose signature is required. If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.
Bankr.R. 9011(a).

courts are created under Article I pursuant to Congress' substantive authority over bankruptcies. Unlike Article III courts, which derive their powers directly from the Constitution, Article I courts' powers are derived wholly from statute. *See, e.g., American Ins. Co. v. 356 Bales of Cotton (Canter),* 26 U.S. (1 Pet.) 511, 545, 7 L.Ed. 242 (1828) (noting that territorial courts' power is conferred by Congress); *Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973) (discussing Congress' power to regulate jurisdiction of courts for the District of Columbia).

■ There can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct presented before the court. The inherent power is recognized in the statutory grant Congress has provided the bankruptcy courts:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). By providing that bankruptcy courts could issue orders necessary "to prevent an abuse of process," Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized exists within Article III courts. *See also In re Courtesy Inns, Ltd. (Jones v. Bank of Santa Fe),* 40 F.3d 1084, 1089 (10th Cir.1994) ("We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers.*"); *In re Pace (Havelock v. Taxel),* 159 B.R. 890, 904 (9th Cir. BAP 1993) (holding that § 105 grants bankruptcy courts the ability to sanction egregious conduct), *aff'd in relevant part,* 67 F.3d 187 (9th Cir.1995).

Caldwell notes, however, that in *In re Sequoia Auto Brokers, Ltd. (Plastiras v. Idell),* 827 F.2d 1281 (9th Cir.1987), we held that bankruptcy courts do not have the inherent power of contempt. *Id.* at 1284. Caldwell argues that because *Sequoia* prevents a bankruptcy court from imposing contempt orders, sanctions are similarly prohibited. Caldwell also argues that the language of *Sequoia* proves that bankruptcy courts have no inherent powers. We disagree.

Our holding in *Sequoia* was based on a thorough review of the then-existing legislative history of the Bankruptcy Code. After examining the history of the Code, we determined that Congress did not intend to give bankruptcy courts contempt power. *Id.* at 1289. However, since our decision in *Sequoia,* two significant changes have occurred. In 1987, Congress reformed Bankruptcy Rule 9020 to read:

> (a) *Contempt committed in presence of bankruptcy judge*
>
> Contempt committed in the presence of a bankruptcy judge may be determined summarily by a bankruptcy judge. The order of contempt shall recite the facts and shall be signed by the bankruptcy judge and entered of record.
>
> (b) *Other contempt*
>
> Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule, may be determined by the bankruptcy judge only after a hearing on notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense.

Bankr.R. 9020. Thus, the power that we noted did not exist under the Bankruptcy Code prior to 1987 was provided to the bankruptcy courts through the modified version of Rule 9020.

Additionally, subsequent to *Sequoia* the Supreme Court announced its decision in *Chambers.* *Chambers* recognizes that courts created by Congress have inherent powers, unless Congress intentionally restricts those powers.

It is true that the exercise of the inherent power of lower federal courts can be

limited by statute and rule, for "[t]hese courts were created by act of Congress." Nevertheless, "we do not lightly assume that Congress has intended to depart from established principles" such as the scope of a court's inherent power.

*Chambers,* 501 U.S. at 47, 111 S.Ct. at 2134 (citations omitted). Congress gave bankruptcy courts the power of contempt through Rule 9020 but placed certain explicit restrictions on that power. However, Congress did not abrogate or restrict the inherent power to sanction. A reasonable construction of Rule 105 confirms that inherent power. *Chambers* instructs us that absent congressional restriction, inherent powers exist within a court as part of the nature of the institution. *See id.* at 43, 111 S.Ct. at 2132.

The subsequent adoption of Rule 9020 by Congress and the subsequent opinion of the Supreme Court in *Chambers* supersedes our opinion in *Sequoia.* Any restriction of the bankruptcy courts' power to sanction that could be inferred from *Sequoia* is no longer pertinent in light of the subsequent developments. Other courts agree. *See, e.g., In re Power Recovery Sys., Inc. (Eck v. Dodge Chem. Co.),* 950 F.2d 798, 802 (1st Cir.1991); *In re Skinner (Mountain America Credit Union v. Skinner ),* 917 F.2d 444, 447 (10th Cir.1990); *In re Walters (Burd v. Walters ),* 868 F.2d 665, 669 (4th Cir.1989).

The facts found by the district court are well supported by the record. Those facts reveal that Caldwell signed a Statement of Affairs in bad faith in which he failed to list valuable assets of the bankruptcy estate, for which the sanction under Rule 9011 is justified. Caldwell, through his control of the debtor corporation abused the bankruptcy process in bad faith, justifying the sanction imposed under the inherent powers of the bankruptcy court acknowledged by Congress in Rule 105.

**AFFIRMED.**