**In re Heinrich ENGEL, Debtor.**

**Office of the U.S. Trustee, Movant,**

**v.**

**Stephen G. Bresset, Esq., Respondent.**

**In re Thomas Corkery and Barbara Corkery, Debtors.**

**Office of the U.S. Trustee, Movant,**

**v.**

**Stephen G. Bresset, Esq., Respondent.**

Bankruptcy Nos. 5–96–02645, 5–95–00137.

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

Feb. 25, 2000.

Gregory Lyons, Office of the U.S. Trustee, Harrisburg, PA, for Movant.

Philip D. Lauer, Easton, PA, for Respondent.

Stephen G. Bresset, Honesdale, PA, for Debtors.

## OPINION

JOHN J. THOMAS, Bankruptcy Judge.

The United States Trustee has requested the imposition of sanctions against Attorney Stephen Bresset in two unrelated matters involving similar issues. Those matters were litigated together and are adjudicated by this Opinion.

### Heinrich Engel

The Heinrich Engel bankruptcy was filed as a Chapter Seven on December 3, 1996. The Petition was endorsed by Attorney Stephen Bresset as counsel for the Debtor. The facts are undisputed that Engel's schedules failed to disclose the Debtor's ownership interest in a closed corporation known as Techniques in Metals, Inc. Bresset's belated attempt to add that asset to the schedules by filing an amendment was rejected by the Clerk's office, inasmuch as the filing was attempted on May 27, 1997, eight days after the case was closed. Compounding the issue, on May 28, 1997, the day after the amendment was attempted, Bresset represented the Debtor at the sale of Debtor's stock interest in the corporation for an alleged consideration of $50,000.[1] Bresset's attempted amendment carried a negative

"book" value for the stock interest. (United States Trustee Exhibit No. 12, Transcript of September 29, 1999 at 2–127 and 2–134.)

The United States Trustee also alleges that certain real estate of the Debtor was undervalued at $58,000 despite Bresset's awareness of a $132,000 appraisal.

After Motions to reopen were filed by both the United States Trustee and Bresset, the Court reopened the case on August 27, 1997. On June 22, 1998, the United States Trustee filed a request for sanctions against Bresset under 11 U.S.C. § 105 and Federal Rule of Bankruptcy Procedure 9011 asking that Bresset be assessed the United States Trustee's costs and expenses for causing the case to be reopened and for obtaining sanctions together with the payment of some additional sanction "to deter future similar conduct." (Doc. # 52.)

Bresset defends the allegations by asserting that a subordinate associate had the responsibility for preparing the schedules and failed to list the stock of the corporation in the appropriate schedule filed December 3, 1996. He acknowledges that the failure to schedule the asset was an oversight, but points out that the corporation was referenced in other places in the filing. (Transcript of November 29, 1998 at 2–84.) The stock of the corporation was sold pursuant to a purchase agreement that was first drafted by Attorney Bresset. (Transcript of September 29, 1998 at 2–87 and United States Trustee Exhibit No. 2.) That stock was further the subject of an opinion letter from Bresset dated May 22, 1997 wherein Bresset opined that Engel had "the authority to transfer said stock in this contemplated transaction." (United States Trustee Exhibit No. 10.) During the hearing on sanctions, Bresset explained that the stock should have been scheduled as an asset

---

1. The testimony repeatedly references the sale consideration as $50,000 (See, for example, Engel testimony at Transcript of 9/29/98 at 2–19), however, the actual Stock Purchase

Agreement sets forth the consideration as $35,000. United States Trustee Exhibit 2. In disposing of the issues before me, the difference is not consequential.

bearing a $1.00 value and then exempted. (Transcript of September 29, 1998 at 2–101.) Bresset argues that the stock was sold for $50,000 because that is the price requested by the Debtor from a co-worker interested in purchasing the business, and who, surprisingly, agreed to pay such sum. (Transcript of September 29, 1998 at 2–156.) Bresset's after-the-fact analysis of the book value of the stock at the time of filing the petition resulted in a nominal valuation listed in the attempted amendment. Bresset confirmed his valuation with the corporate accountant. (Transcript of September 29, 1998 at 2–175.) He further acknowledges that the sale of the stock prior to it being scheduled was a "mistake." (Transcript of September 29, 1998 at 2–121.)

No explanation was proffered as to why the real estate was scheduled at a $58,000 value when it had previously been appraised at $132,000. Bresset presumed that his associate arrived at that valuation. (Transcript of September 29, 1998 at 2–104.) Bresset, nonetheless, acknowledged suggesting to his associate that "the value range was somewhere in the area probably of $60,000." (Transcript of September 29, 1998 at 2–116 and 2–153.) This tends to corroborate Engel's testimony that Bresset told him that he, Bresset, would "take care of [valuation issues]." (Transcript of September 29, 1998 at 2–29.) Bresset speculated that the property may have had environmental problems as an explanation for the reduced value. In fact, at an earlier deposition, he addressed the issue as if it had been a *fait accompli*. "That property has one big, glaring problem ... [i]t is a steel fabricating business with a whole host of environmental problems in the basement." (Transcript of September 29, 1998 at 2–112.) While Engel did maintain a steel fabricating business on the premises, Bresset had no specific evidence of an environmental issue, such that would diminish the value of the property.

**2. Rule 9011. Signing of Papers; Representations to the Court; Sanctions; Verification and Copies of Papers**

*Thomas and Barbara Corkery*

The matters in *Engel* were joined with the *Corkery* issues because Attorney Stephen Bresset was again the focus of a sanction motion filed by the United States Trustee based on parallel facts, as follows.

In *Corkery*, the United States Trustee requests sanctions be issued under 11 U.S.C. § 105. The United States Trustee alleges Bresset, as counsel for the Corkerys, failed to include in the schedules a known interest in a corporation identified as TJC Developers, Inc. (TJC), as well as a significant financial claim against a third party that was pending in Bucks County Court of Common Pleas at the time of filing. (United States Trustee's Request to Impose Sanctions (Doc. # 31) and Transcript of September 29, 1998 at 2–214.) Sanctions similar to that requested in *Engel* are prayed for in *Corkery*.

Bresset acknowledges that the interest in TJC was not disclosed and that the lawsuit was not listed on the Debtors' bankruptcy schedules filed March 10, 1995. (Transcript of September 29, 1998 at 2–221 and Brief of Respondent filed to case number 5–96–02645 (Doc. # 74).) He admits an awareness of pending litigations as early as February 13, 1995 when such litigations were referenced in a filed Motion to Extend the Time to File Schedules and the Statement of Affairs. (Doc. # 7.) Specific litigation was referred to in correspondence to Bresset received February 23, 1995. (Transcript of September 29, 1998 at 2–221.) In fact, that correspondence, (United States Trustee Exhibit No. 15), from the Corkerys' then-counsel referenced a potential $800,000 claim by Corkery against various individuals arising out of a contract dispute.

*Discussion*

The United States Trustee argues that Federal Rule of Bankruptcy Procedure 9011 [2] has been violated by the filing of

(a) *Signing of papers.* Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at

inaccurate schedules.

While the petition in bankruptcy is subject to the safeguards provided by

least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

(b) *Representations to the Court.* By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) *Sanctions.* If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) *How Initiated.*

(A) *By Motion.* A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may

Federal Rule of Bankruptcy Procedure 9011, its plain reading appears to exclude the bankruptcy schedules and statement of

award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) *On Court's Initiative.* On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) *Nature of Sanction; Limitations.* A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

(B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

(3) *Order.* When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

(d) *Inapplicability to Discovery.* Subdivisions (a) through (c) of this rule do not apply to disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of Rules 7026 through 7037.

(e) *Verification.* Except as otherwise specifically provided by these rules, papers filed in a case under the Code need not be verified. Whenever verification is required by these rules, an unsworn declaration as provided in § 28 U.S.C. 1746 satisfies the requirement of verification.

(f) *Copies of Signed or Verified Papers.* When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original.

affairs from its provisions. Federal Rule of Bankruptcy Procedure 9011(a). *In re Palumbo Family Ltd. Partnership,* 182 B.R. 447, 475–76 (Bankr.E.D.Va.1995); *Cohn v. United States Trustee (In re Ostas),* 158 B.R. 312, 319 (N.D.N.Y.1993). Moreover, I note the rather specific procedure that must precede a motion under Federal Rule of Bankruptcy Procedure 9011. Prior to filing such a motion, the movant must serve the offending party with the Rule 9011 motion to afford the respondent an opportunity to correct the document. This provision is known as the safe harbor provision of Bankruptcy Rule 9011(c)(1)(A). *Toth–Fejel v. Kramer and Toth–Fejel Law Firm,* 1999 WL 1012870, at *5 (D.Ore.1999). Because there was apparently no such advance service of the Motion here, the sanction request under Federal Rule of Bankruptcy Procedure 9011 cannot be considered. *In re Russ,* 218 B.R. 461, 468 (Bankr.D.Minn.1998); *Affirmed in part and denied in part by In re Russ,* 187 F.3d 978 (8th Cir.1999).

■ In these cases, the United States Trustee also references the "catch-all" powers of a bankruptcy court, i.e. 11 U.S.C. § 105, as providing the authority for the issuance of sanctions.

The authorities are split as to whether § 105 provides a separate source of sanction power. Some say it does. *Matter of Volpert,* 110 F.3d 494, 500 (7th Cir.1997). (Explaining that this power exists in lieu of the absence of powers under 28 U.S.C.A. § 1927). Others insist that § 105 cannot empower a judge to make substantive law. See generally, Nickles, Steve H. and R. Epstein, "Another Way of Thinking About Section 105(a) and Other Sources of Supplemental Law Under the Bankruptcy Code," 1999.

It has been suggested that § 105 is a "codification" of the inherent power of the court to supervise the activities of those appearing before it. *Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd.),* 40 F.3d 1084, 1089 (10th Cir.1994) (We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in Chambers.); *accord, Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.),* 77 F.3d 278 (9th Cir. 1996). (Articulating that § 105 is a recognition of the inherent power of the court to regulate the proceedings before it.) *Id.* at 284–85; *In re Chisum,* 68 B.R. 471, 473 (9th Cir. BAP 1986) *(same), aff'd* 847 F.2d 597, *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). I agree with these cases and conclude that § 105 does, indeed, authorize the bankruptcy court to exercise its inherent powers.

■■ Merely because I have found insufficient grounds for the issuance of sanctions under Rule 9011 does not bar me from exercising the inherent power of this court. *Gillette v. Bayernwald–Fruchteverwertung,* 977 F.2d 809, 813 (3rd Cir.1992). In fact, the inapplicability of Rule 9011 may justify the invocation of this court's inherent power. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50 111 S.Ct. 2123, 2136 115 L.Ed.2d 27 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."); *Heffernan v. Hunter,* 189 F.3d 405 n. 7 (3rd Cir.1999) ("Courts have the inherent power to sanction attorneys for bad-faith conduct that is not otherwise covered by Rule 11 or section 1927"); *Martin v. Brown,* 63 F.3d 1252, 1262–63 (3rd Cir.1995) ("Generally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists."). Notwithstanding this power, the inherent authority of the Court must be exercised

with restraint and discretion. *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132, 115 L.Ed.2d 27 (1991).

The elimination of Rule 9011 as a grounds for sanction is important. Sanctions under Rule 11[3] merely require a showing of objectively unreasonable conduct. *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225 (3rd Cir.1995). This is a comparatively light burden. On the other hand, relying on the inherent authority of the court to sanction the Respondent requires a finding of "bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 2135, 115 L.Ed.2d 27 (1991); *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284–85 (9th Cir.1996) 447 U.S. at 767, 100 S.Ct. at 2465; *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1225 (3rd Cir.1995). The "[t]erm 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed.1990).

In *Engel*, Bresset submitted and advocated schedules that were clearly inaccurate. As Bresset readily admits, the failure to schedule Engel's stock interest in Techniques in Metal, Inc. was initially negligent. While likely the case, since the corporation was mentioned in Debtor's schedules as a co-debtor no less than three times, Bresset had numerous opportunities to address this oversight. He should have noticed the omission when he signed the original petition on or about December 2, 1996 or at the First Meeting of Creditor's on January 8, 1997. Bresset was given further opportunity to review the status of the schedules on each of three occasions that he was asked by the buyer's counsel for an "opinion letter" as to the impact that bankruptcy had on Engel's ability to transfer the assets in question. See United States Trustee Exhibit Nos. 8, 9, and 10 (Letters of March 13, 1997, April 2, 1997, and May 20, 1997, respectively). His cavalier attempt to amend the schedules by including the stock at a $1.00 value on the day prior to closing on the stock for $50,-000 bespeaks, at least, an extreme insensitivity to the responsibilities of the Bankruptcy Trustee to review assets. At worse, Bresset's action works a fraud on the buyer of the stock, who has apparently received nothing for his consideration since an unscheduled asset remains property of the estate and is not deemed abandoned to the Debtor pursuant to 11 U.S.C. § 554(c). *Hutchins v. I.R.S.*, 67 F.3d 40, 43 (3rd Cir.1995). While Bresset's failure to initially schedule the stock as an asset was negligent, his failure to disclose the stock after many opportunities to review the original filing shows a reckless disregard for the requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. His belated and unsuccessful attempt to later schedule the stock at a value far below the Debtor's sales price without disclosure to the Bankruptcy Trustee and to then complete the sale, knowing that the Trustee was not likely to be aware of its imminent liquidation, evidences just that sort of wanton misconduct necessary to invoke the sanction powers of the Court.

Notwithstanding Bresset's clear error in collaborating in the attempted sale of this estate asset, his explanation of the reasons for not advising the Trustee of the consideration for the stock was disingenuous. Bresset speculated that since the stock had a negative book value at the time the bankruptcy was filed on December 2, 1996, the consideration paid at closing on May 27, 1997 was entirely irrelevant. (Transcript of September 29, 1998 at 2–125 and 2–142 and 2–170.) This rationalization

---

**3.** Cases disposed of under Federal Rule of Civil Procedure 11 are helpful in analyzing Federal Rule of Bankruptcy Procedure 9011.

*Stuebben v. Gioioso*, 979 F.2d 956, 960 (3rd Cir.1992).

does not justify what clearly amounts to an effort to deprive a Bankruptcy Trustee from a full appreciation of either (1) the extent of an offer to purchase an estate asset, or (2) substantive evidence of the market value of that asset. Bresset's actions come dangerously close to outright fraud. *U.S. v. Rosen*, 130 F.3d 5, 10 (1st Cir.1997). In disposing of the matters before me, I need not make such a finding.

Just as it was with the stock, Bresset's scheduling of a market value of Engel's real estate at less than half of the appraised valuation was apparently intended to minimize the possibility of administration by the Trustee.

The root of the problem is not difficult to fathom. After several meetings with the client, the schedules were prepared by an associate who did not review them. (Transcript of September 26, 1999 at 1–27.) Bresset, in fact, disavowed responsibility for their preparation.[4] The schedules were reviewed by Bresset, but apparently not in the presence of the client. (Transcript of September 29, 1998 at 2–84.) They were signed but not read by the client and only in the presence of Bresset's secretary. (Transcript of September 29, 1998 at 2–10.)

Bresset is a busy and capable practitioner whose zealous advocacy and "seat of the pants" representation has pushed the envelope far beyond the ethical limits that can be tolerated by this Court. This raises the ultimate question before me. Just what is the lawyer's responsibility in drafting accurate schedules?

The United States Code provides for criminal penalties for the signator of false documents. 18 U.S.C. § 152. This provision, however, does not address the responsibilities of counsel.

The official bankruptcy schedules and statement of affairs forms provide a well-designed format in a relatively easily understood language geared toward eliciting necessary and relevant information from a bankruptcy filer. While the average layperson should be able to articulate responses to all inquiries, that is not to say that queries within the form cannot pose pitfalls that only an experienced legal practitioner is capable of negotiating. The most obvious example may be that at issue before me, i.e. the meaning of the term "market value" used in Schedules A and B (real and personal property listings). It has only been recent that our Supreme Court has addressed the lingering conflict over the significance of the use of the term "value" in the context of the applications of certain provisions of the Bankruptcy Code. *Associates Commercial Corporation v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) ("[O]ur use of the term replacement value is consistent with the Ninth Circuit's understanding of the meaning of fair-market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition.") The mechanism of the valuation of assets has significant repercussions to debtor, creditor and trustee in any given case.

The explanation of debtor counsel's role in assigning a value to a given asset lies in a review of the Model Rules of Professional Conduct which are applicable to cases before this Court. *In Re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 160 (3rd Cir.1984); *Kaminski Brothers, Inc. v. Detroit Diesel Allison Div. of General Motors Corp.*, 638 F.Supp. 414, 415 (M.D.Pa. 1985). In explaining to a client the nuances of certain terminology, Model Rules of Professional Conduct 1.4(b) states, "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The obvious rationale for

---

4. Q. by Gregory Lyons, counsel for the Assistant United States Trustee. "Right. Okay, so despite what Henry told you, you were okay with listing the property with a value of $58,-000, correct?"

A. by Stephen Bresset, Esq. "I didn't prepare the schedules, Mr. Lyons." Transcript of September 29, 1998 at 2–114.

such direction is the concern that a client have sufficient information to participate intelligently in the decisions that the client must make. See Comment to Rule 1.4. The ultimate decisions regarding the matter at hand, including the content of the bankruptcy schedules, remain the clients. This theme is emphasized in the comment to Model Rules of Professional Conduct 2.1 indicating, "[i]n general, a lawyer is not expected to give advice until asked by the client." This does not mean, however, that a lawyer can blithely allow a client to casually complete *or review* the official schedules and statements without guidance as to the consequences of such action. "[W]hen a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client, duty to the client under Rule 1.4 may require that the lawyer act if the client's course of action is related to the representation." MRPC Rule 2.1. This is certainly applicable if a client is allowed to execute these critical documents without adequate review, especially because of the rather serious ramifications emanating from erroneous filings.

The upper limits of Engel's opinion of value of the stock was clearly evidenced by the fact that he proposed to sell "the business" to his buyer for $50,000 shortly after filing the bankruptcy. (Transcript of September 29, 1998 at 2–47.) This is markedly divergent from the $1.00 valuation shown by Bresset on the attempted amended schedule. While it is not unusual for a lawyer to counsel a client on the mechanics for determining such things as "market value" for scheduling purposes, an attorney can never substitute his or her judgment for that of the client. In the final analysis, it is the client's integrity, not that of the lawyer, which sustains and supports the verification of documents submitted under penalty of perjury. This proposition comes home to roost when we consider that undervaluation of property can be tantamount to the attempted concealment of assets. *United States v. Walker,* 29 F.3d 908, 913 (4th Cir.1994). As mentioned in *Taylor v. Freeland &*

*Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), "Debtors *and their attorneys* face penalties under various provisions for engaging in improper conduct in bankruptcy proceedings." *Id.* at 503 U.S. at 644–45, 112 S.Ct. at 1648–49 (emphasis ours).

I am satisfied Bresset made errors in his representation of Engel that went beyond mere negligence, as follows. First, Attorney Bresset attempted to amend the bankruptcy schedules by identifying the shares of stock in Techniques in Metal and referencing its negative *book* value, but omitting any reference to *market* value in what I find to be a deliberate attempt to conceal the true worth of the corporate stock. (United States Trustee Exhibit No. 12.) Second, Bresset erred in advancing the transfer of this stock. At the time of the sale, Bresset knew that the Trustee was not likely to have had the opportunity to review the circumstances of the sale. Even had the proffered amended Schedule B been filed, no attempt was made to exempt the stock. The stock remained a bankruptcy asset.

In similar fashion, Bresset's disregard for the accuracy of the schedules resonates in his representation of the Corkerys and explains his failure to schedule either the corporate stock owned by Thomas Corkery, or any of the then-pending litigations referenced on the record.

Bresset filed a Chapter Seven bankruptcy petition for Thomas J. Corkery and Barbara A. Corkery on February 1, 1995. At the time of filing, Bresset was aware of a lawsuit by Thomas Corkery against Robert Quick. (Transcript of September 30, 1998 at 3–44.) The completed schedules and statements were filed on March 10, 1995. (United States Trustee Exhibit No. 14.) The schedules ignore the lawsuit against Quick. If Bresset's omission after consulting with his clients was an inadvertent oversight, he should have been reminded by correspondence from Corkery's non-bankruptcy counsel received on February 28, 1995. (United States Trustee

Exhibit No. 32.) Bresset admitted that the schedules should have included information regarding the litigation. (Transcript of September 30, 1998 at 3–45 and 3–75.) Bresset acknowledges his lapse in failing to list this and other litigations being prosecuted by Corkery but attempts to shift the responsibility for this oversight onto the drafter (presumably an office paralegal or secretary). (Transcript of September 30, 1998 at 3–50.) He views the problem as a simple act of omission—mere negligence. (Transcript of September 30, 1998 at 3–63.)

Much as he did in *Engel*, Bresset minimized the gravity of his failure to include Corkery's corporate stock by stating to the Court at an August 14, 1995 hearing that the stock interests were minority interests in a "non-operational, no-asset real estate marketing company." (Record of August 14, 1995 (tape only).) Nowhere, however, in the record of this proceeding did Bresset reconcile this conclusion with the February 21, 1995 correspondence received from Corkery's litigation counsel alluding to a series of significant claims advanced by Corkery and his "company." (United States Trustee Exhibit No. 15.)

Bresset's defense is succinct and is evidenced by the following exchange between counsel for the Assistant United States Trustee and Bresset:

Q. "When did you first learn that Mr. Corkery had an interest in a corporation under the name of TJC Development or TJC, Inc.?"

A. "Off hand I don't recall whether or not I ever received confirmation...."

Transcript of September 30, 1998 at 3–7.

Bresset cannot escape responsibility for filing improperly drafted schedules so easily. He was given ample reason to question the documents that he filed of record in this case. He had a corresponding obligation to reasonably and expeditiously investigate its accuracy and tender amendments, if necessary. If his clients declined to cooperate in this disclosure, Bresset would have had cause to withdraw from the case. *In re Matthews*, 154 B.R. 673, 680 (Bankr.W.D.Tex.1993). I arrive at this conclusion by a plain reading of Model Rule of Professional Conduct 3.3, Candor Toward the Tribunal, which reads, as follows:

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

Counsel is obligated both ethically and as an officer of the court not to file schedules and other disclosure documents that the counsel believes inaccurate. Thus, courts have cautioned that before filing a petition, schedules, etc., it is incumbent upon counsel to "take all possible steps to assure himself that the information listed in his client's petition is correct ... inquire as to amounts owed [secured by any assets] and to explain the requirements of full disclosure...."

1 William L. Norton, Jr., Norton Bankruptcy Law & Practice 2d § 27:25 at 27–76 (1998) (footnotes omitted)

 The obligation to file accurate schedules includes a continuing duty to correct errors in filed documents. *Torgenrud v. Benson (In re Wolcott)*, 194 B.R. 477, 486 (Bankr.Mont.1996). Attorney Bresset's attempt to minimize his culpability for these incorrect filings by shifting the responsibility for the errors on the alleged drafter, be it an associate or a nonlawyer assistant, is of little account. The very essence of Model Rules of Professional Conduct 5.1 (Responsibilities of a Partner or Supervisory Lawyer) and 5.3 (Responsibilities Regarding Nonlawyer Assistants) is designed to place accountability on the supervising attorney. Regardless of who drafted the schedules, Bresset's obligation to competently represent his client required him to review these documents with his clients before they became a part of the public record. Moreover, under both Model Rules of Professional Conduct 5.1(c)(2) and 5.3(c)(2), the supervising attorney has a specific obligation to take timely remedial action to rectify an assistant's failures. This becomes especially true, where, as here, a material omission can support a conviction for bankruptcy fraud. "Even if the asset is not ultimately determined to be property of the estate under the technical rules of the Federal Bankruptcy Code, Section 152 [of Title 18] properly imposes sanctions on those who preempt a court's determination by failing to report the asset." *United States v. Cherek*, 734 F.2d 1248, 1254 (7th Cir.1984), *cert. denied*, 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985). This failure to act after becoming aware of the shortcomings in the schedules in the cases of both *Engel* and *Corkery* is more troubling to me than Bresset's negligence in filing the original schedules. Bresset's casual approach to the filing of the bankruptcy schedules and his dilatory response in amending known deficiencies require the issuance of sanctions.

While the written Motions for Sanctions in *Corkery* and *Engel* appear to be limited to a demand for reimbursement of costs and a fine, the United States Trustee argued at hearing that Bresset should be suspended from the practice of law. (Transcript of September 29, 1998 at 2–211, 2–212.)

 Sanction requests are serious matters with critical consequences. They are no less deserving of due process than other forms of litigation. A vague demand for "appropriate relief" is inadequate notice to a respondent. *Gagliardi v. McWilliams*, 834 F.2d 81, 82 (3rd Cir.1987). Notice is essential. "The conduct, alleged to be sanctionable, must be disclosed in advance." *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225 (3rd Cir.1995). Moreover, "particularized notice . . . as to the form of the contemplated sanction" is required, (*In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 387 (3rd Cir.1997)), as is the "legal rule on which the sanctions were based." *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215 (3rd Cir.1995), *Jones v. Pittsburgh National Corp.*, 899 F.2d 1350 (3rd Cir.1990). While it may be possible to dispense with articulation of the specific authority under which the Court is acting, it is positively critical that the respondent be advised of "the particular factors that he must address if he is to avoid sanctions." *Fellheimer, Eichen & Braverman, P.C.* at 1225–1226. Our Circuit, in *Simmerman v. Corino*, 27 F.3d 58 (3rd Cir. 1994), spelled out three prerequisites of adequate notice. They are "(1) the fact that . . . sanctions are under consideration, (2) the reasons why sanctions are under consideration, and (3) the form of sanctions under consideration." *Id.* at 64. While articulated in a Rule 11 case, these requirements are equally applicable to the use of this Court's inherent power to sanction. This principle is now well established in the Third Circuit, *see, e.g., In re Tutu Wells*, 120 F.3d at 379, and finds support elsewhere as well, *see Jensen v. Federal Land Bank of Omaha*, 882 F.2d

340, 341 (8th Cir.1989); *Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*, 834 F.2d 833, 836 n. 5 (9th Cir.1987). These minimum standards of due process negate any possibility that I could suspend Attorney Bresset as requested by the United States Trustee.

Sanctions ideally operate as instructional tools to deter parties and attorneys whose conduct has not met the requisite professional standards from continuing on their wayward course of conduct. If the inherent power of the court is to be exercised at all, it should be utilized to discourage a repetition of the careless practices evidenced by the cases before me. While suspending counsel would certainly discourage repetition, for the reason earlier indicated, that option is not available to me. Nevertheless, the inherent power certainly includes the power to fine. *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 383 (3rd Cir.1997). I am satisfied that a financial assessment would provide sufficient disincentive so as to discourage a disregard for the accuracies of future filings. In that regard, I assess Mr. Bresset the sum of $2,500 in each of the two cases before me payable to the Clerk of the Bankruptcy Court. I am also satisfied that the United States government should be reimbursed for the time and expense associated with bringing these cases to my attention. An itemization of such fees and costs shall be filed of record and served within fifteen (15) days of the date of this decision. Stephen G. Bresset shall have ten (10) days thereafter to register an objection to that itemization and, consistent with the bifurcated nature of the trial, request a hearing thereon. (Transcript of September 30, 1998 at 3–102.)

An Order will follow.