FILED
United States Court of Appeals
Tenth Circuit

September 17, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

VEHICLE MARKET RESEARCH, INC.,

Plaintiff - Appellant,

v.

MITCHELL INTERNATIONAL, INC.,

Defendant - Appellee.

No. 12-3333

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:09-CV-02518)

Nora M. Kane (Mark J. Peterson on the brief), of Stinson Morrison Hecker, Omaha, Nebraska for Plaintiff-Appellant.

Allyson N. Ho of Morgan Lewis & Bockius, Dallas, Texas (Anthony J. Durone of Berkowitz Oliver Williams Shaw & Eisenbrandt, Kansas City, Missouri; Scott T. Schutte and Ted M. Warden of Morgan Lewis & Bockius, Chicago, Illinois with her on the brief), for Defendant-Appellee.

Before **KELLY**, **EBEL**, and **BACHARACH**, Circuit Judges.

**EBEL**, Circuit Judge.

This is a judicial estoppel case, which is controlled by two principles: our

reluctance to impose the harsh remedy of judicial estoppel, and the failure by the party asserting judicial estoppel to bear its burden to point to clearly inconsistent statements in support of its arguments.

The case involves statements made by plaintiff Vehicle Market Research, Inc. (VMR) in a breach of contract case that were allegedly inconsistent with earlier statements by the sole owner and alter-ego of that company, John Tagliapietra, in his Chapter 7 bankruptcy proceeding.[1] Specifically, VMR developed and owned certain intellectual property (referred to in the contract as "Materials and Intellectual Property")—including a software system to calculate the value of a total loss of an automobile for the purposes of the automobile insurance industry (the "TLSS Product") and certain "pre-existing software tools, utilities, concepts, techniques, text, research or development" used in the development of TLSS (the "Pre-Existing Materials"). (R. Vol. I at 261, ¶8.1.) When Mr. Tagliapietra filed for personal bankruptcy, he asserted that his shares in VMR were worth nothing. A few years later, as the bankruptcy was winding down, VMR sued Mitchell International, Inc. (Mitchell), the company to which it had exclusively licensed the Materials and Intellectual Property, seeking up to $4.5 million in damages for the alleged misappropriation of the Materials and Intellectual Property. The question before us is whether the statements by VMR and Mr. Tagliapietra in the litigation against Mitchell were so clearly contrary to the statements made by Mr.

---

[1] It is conceded that VMR and Mr. Tagliapietra are alter-egos of each other, so we will not further address that issue.

Tagliapietra in his bankruptcy proceeding that VMR should be judicially estopped from proceeding with its suit against Mitchell.

There is no doubt that when Mr. Tagliapietra filed his bankruptcy, he listed the value of VMR's stock as 0.00. He did not amend that statement, except to approve the bankruptcy Trustee's valuation of the shares at a value of "unknown" at some point in 2009, around the time that he was preparing to file his lawsuit (in the shoes of VMR) against Mitchell. As a result of Mr. Tagliapietra's representations in the bankruptcy court, the Trustee and the bankruptcy court awarded Mr. Tagliapietra a discharge of his debts based in part on the assumption that his company was worthless.

Turning to the VMR litigation at hand against Mitchell, VMR alleged in the unverified complaint that it was entitled to up to $4.5 million on its contract with Mitchell authorizing Mitchell to use the Materials and Intellectual Property. In Mr. Tagliapietra's 2011 deposition in the instant litigation, he acknowledged that the Pre-Existing Materials, the existence of which preceded the filing of his bankruptcy, were worth $4 million in 2009.

We review the doctrine of judicial estoppel with guidance telling us we should apply it sparingly and require a clearly inconsistent statement before invoking it. We conclude that neither VMR's litigation claim for payments until they reach a cap of $4.5 million nor Mr. Tagliapietra's deposition testimony in that lawsuit—that VMR was entitled to "up to" $4 million in royalties and that, in 2009, the Pre-Existing Materials were worth $4 million—is clearly inconsistent with his valuation of 0.00 for his VMR

3

stock at the time of his bankruptcy petition in 2005, the date when the initial bankruptcy representations were made.

If there were grounds for judicial estoppel, it would have to be based on a duty by Mr. Tagliapietra to amend his bankruptcy pleadings to report a possible increased value for his VMR stock at least as of the time that VMR filed its suit against Mitchell in 2009. However, our precedent is not clear on whether a debtor has a continuing duty to amend his bankruptcy schedules when the estate's assets change in value. Given our reluctance to invoke judicial estoppel, and keeping in mind that judicial estoppel is an affirmative defense that its proponent must prove, we conclude that in this case Mitchell has not met its burden of showing any clearly inconsistent statements that would warrant that relief. We therefore REVERSE the district court's opinion as an abuse of discretion.

## BACKGROUND

### I.      Development of VMR's product and licensing to Mitchell

Mitchell is a company providing various products and solutions for insurance companies and collision repair facilities. John Tagliapietra was Mitchell's employee at the time he conceived of the TLSS Product, which is "a product that assists automobile insurers in providing a fair market value for a vehicle that has been declared a total loss. . . ." (R. Vol. II at 540.).  As Mitchell was Mr. Tagliapietra's employer, Mitchell had the option to develop the system further within its company, but instead gave Mr. Tagliapietra permission to develop it on his own and retained a right of first refusal to license the resulting software product.  Mr. Tagliapietra incorporated VMR in 1997 to

4

develop the TLSS product. Mr. Tagliapietra is VMR's sole shareholder and decisionmaker.

Mitchell became VMR's exclusive licensee, marketing the TLSS product VMR developed as iNTOTAL. To facilitate that arrangement, in 1998 VMR and Mitchell executed a Computer Programming and System Integration Services Agreement (the "Agreement") for the licensing of the Materials and Intellectual Property, which provided:

> **8.1 Ownership of Materials and Intellectual Property:** During the term of this Agreement and upon completion of all payments due, termination, cancellation, or expiration of this Agreement, but subject to the provisions of Paragraph 28 hereof, VMR shall immediately turn over all items (including the TLSS Product, Work Product or work in process) in its possession which were prepared pursuant to this Agreement or made available to VMR, . . . used in developing the TLSS Product and Work Product and all rights, title, and interest or other materials furnished to VMR by MITCHELL during the course of VMR performing Professional Services, and all copies thereof. . . .
>
> Notwithstanding the foregoing, VMR retains all right, title and interest in, and to, any pre-existing software tools, utilities, concepts, techniques, text, research or development methods that VMR used in or applied to the development of the TLSS Product (the "Pre-Existing Materials").
>
> VMR hereby grants MITCHELL an exclusive right and license to modify, adapt, reproduce, use and distribute the Pre-existing Materials as part of the TLSS Product and as part of any adaptations, updates, enhancements or other derivative works based thereon.

(R. Vol. I at 261, ¶8.1.) Thus, the Agreement encompassing the Materials and Intellectual Property provided for Mitchell to license, use, and distribute, as part of the TLSS Product, "any pre-existing software tools, utilities, concepts, techniques, text, research or

5

development methods that VMR used in or applied to the development of the TLSS Product," a.k.a the Pre-Existing Materials, but VMR retained title to those Pre-Existing Materials.[2]

The Agreement mandated royalty payments from Mitchell to VMR such that each time the TLSS Product was used to determine whether a vehicle was a total loss, it would result in payment of no less than a $1.00 royalty to VMR, with a cumulative royalty maximum to VMR of $3,500,000 over the life of the Agreement. Mr. Tagliapietra resigned from his position with Mitchell in 2000. Later, in 2002, the parties amended the Agreement to provide for a higher cumulative royalty maximum of $4,500,000. Over the course of the Agreement, the monthly royalties Mitchell paid VMR amounted to between $200 and $3,300. Mitchell paid VMR these royalties until September 2005 at the latest. Sometime during September 2005, Mr. Tagliapietra spoke by phone with Mitchell's in-house counsel, Jason Gray, and asked why the royalty payments had stopped. Mr. Tagliapietra received no response, but in December 2005, Mr. Tagliapietra saw Mr. Gray at a Costco store and brought up their September phone conversation, noting that Mr. Gray had not followed up with him. Mr. Tagliapietra again asked why Mitchell had stopped paying royalties, and Mr. Gray told him that Mitchell "had paid enough."

In fact, Mitchell had begun to develop its own total loss product in 2003, and, on

---

[2] The Agreement included the value of: 1) any royalty interest from use of the TLSS Product and the Pre-Existing Materials; and 2) any residual value of the Pre-Existing Materials which VMR retained. Both of these values will be included when we refer to the Agreement for Materials and Intellectual Property.

November 2, 2005, Mitchell released its product to the market under the name Total Loss Valuation ("TLV"). Mr. Tagliapietra found out that the TLV product was being developed in December 2005. After looking into the TLV product he discovered that Mitchell's website was no longer marketing iNTOTAL, the product using his TLSS Product. Upon inquiry, a contact at Mitchell told him that iNTOTAL was no longer used by Mitchell. However, Mitchell never terminated the Agreement.

## II.     The bankruptcy proceeding and VMR's lawsuit

On October 14, 2005, Mr. Tagliapietra filed for Chapter 7 bankruptcy—which was after Mitchell stopped paying VMR royalties but before Mr. Tagliapietra discovered Mitchell was no longer using the TLSS Product.

At the time of his bankruptcy petition, Mr. Tagliapietra listed the value of his VMR stock as "0.00." According to his brief, this valuation was based on the fact that VMR: "was no longer receiving royalties from Mitchell; had no expectation of receiving additional royalties from Mitchell; did not have possession or right to possess the software developed for Mitchell because the Agreement was never terminated; and had no other assets." VMR Br. at 4. When Mr. Tagliapietra filed for bankruptcy, he did not know of the TLV product Mitchell was developing.

It was about two years after filing for bankruptcy, in mid-2007, that Mr. Tagliapietra began to suspect that Mitchell's TLV product violated the Agreement by using the Materials and Intellectual Property. In July 2009, Mr. Tagliapietra viewed the TLV product at a client's facility, which convinced him that Mitchell had used VMR's

7

Materials and Intellectual Property to develop its TLV product.

VMR sued Mitchell on October 5, 2009 for breach of contract and breach of the covenant of good faith and fair dealing, among other causes of action, claiming that "Mitchell has an obligation to pay VMR royalties . . . and . . . future royalties . . . at a rate of $1.00 per transaction . . . until the total of payments to VMR equals $4.5 million." (R. Vol. I at 24-25, 29.)  Meanwhile, on October 20, 2009, fifteen days after VMR filed its lawsuit against Mitchell, the bankruptcy court entered its order approving Mr. Tagliapietra's discharge, and closed the estate. In the final account and certification, the Trustee valued Mr. Tagliapietra's profit sharing in VMR and two other companies as "unknown." Mr. Tagliapietra approved that final report.

Discovery materials from VMR's lawsuit showed that several Mitchell employees testified that Mitchell relied in some way on VMR's Materials and Intellectual Property to create Mitchell's TLV product. Discovery in the VMR litigation also revealed the following testimony related to Mr. Tagliapietra's valuation of the Pre-Existing Materials from a November 3, 2011 deposition of Mr. Tagliapietra:

> MR. SCHUTTE [Attorney for Mitchell]: I'm not talking about – I'm not talking about – I will stipulate right now that that is an issue that is open as to what the amount of damages is. Okay. Mr Tagliapietra has said over and over again that he doesn't know if it's 4 million. It could be more. It could be less. That's an issue to be determined.
>
> BY MR. SCHUTTE:
> Q        My question is when the complaint was filed on October 5th of 2009, did you believe that the statement that "Mitchell owes VMR," let's say, "up to $4 million in royalties" was an accurate statement?

[BY MR. TAGLIAPIETRA:]

A        I believe that to be an accurate statement.

Q        Okay. VMR is the owner of the – as we talked about at length yesterday – the preexisting materials. Correct?

A        Yes.

Q        Do you think those preexisting materials have any value?

MS. KANE [ATTORNEY FOR MR. TAGLIAPIETRA/VMR]: It's a yes-or-no question.

THE WITNESS [MR. TAGLIAPIETRA:]: Yes, they have value.

BY MR. SCHUTTE:

Q        What value do they have? I'm not asking for a dollar number. I'm asking for –

[BY MR. TAGLIAPIETRA:]

A        Four million dollars' worth.

Q        Okay. And you were entitled, according to your interpretation of the contract, the-the- the—excuse me—the preexisting materials, all the way back in 1998. Correct?

MS. KANE:  Object to form.

THE WITNESS [MR. TAGLIAPIETRA]: Those preexisting materials existed in 1996 and 1997.

(Id. at 233-35.)[3]

The district court granted summary judgment on judicial estoppel grounds. The district court first determined that it would pierce VMR's corporate veil and equate VMR with its alter-ego Mr. Tagliapietra; neither party challenges that holding. The district court then held that Mr. Tagliapietra was not judicially estopped from pursuing his action based on Mr. Tagliapietra's non-disclosure of VMR's inchoate lawsuit against Mitchell in Mitchell's initial bankruptcy filing because Mitchell's allegedly wrongful conduct was not apparent until after Mr. Tagliapietra filed his bankruptcy petition. However, the

---

[3] In this testimony, Mr. Tagliapietra expressed his belief that the Pre-Existing Materials were worth $4 million dollars, which we assume is a rough estimate in line with his (non-verified) complaint alleging that VMR was entitled to total payments up to $4.5 million.

9

district court concluded that VMR was judicially estopped from pursuing its action based on the inconsistency of Mr. Tagliapietra's valuation of VMR's stock in its action against Mitchell as compared to his 0.00 valuation of the VMR stock in his bankruptcy. The district court found that VMR's breach of contract claim was based on the allegation of Mitchell's use of the Pre-Existing Materials. Relying on the exchange above, the district court concluded that "[t]he fact that the preexisting materials themselves had value means that VMR was worth something at the time Tagliapietra filed his petition for bankruptcy." (R. Vol. II at 555) (emphasis in original). The district court also concluded that the other requirements for judicial estoppel were met—in its view, Mr. Tagliapietra's actions appeared to be a deliberate attempt to mislead the bankruptcy court, and that this provided Mr. Tagliapietra an unfair advantage in the present action.

When VMR moved to alter or amend the judgment under Fed. R. Civ. P. 59(e), the district court "explained that the stock was an asset that existed pre-petition, unlike the cause of action in this case, so Tagliapietra had a continuing duty to disclose its true value" to the bankruptcy court. (R. Vol. II at 581.) The district court denied VMR's motion to alter or amend. VMR appeals the district court's grant of summary judgment to Mitchell.

## DISCUSSION

### I.      The doctrine of judicial estoppel

"The doctrine of judicial estoppel is based upon protecting the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to

10

the exigencies of the moment.'" Bradford v. Wiggins, 516 F.3d 1189, 1194 (10th Cir.

2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). Although there

is no precise formula for judicial estoppel, Bradford, 516 F.3d at 1194, generally,

> the doctrine applies when (1) a party takes a position clearly inconsistent with an earlier-taken position; (2) adopting the later, inconsistent, position would create an impression that either the earlier or the later court was misled; and (3) allowing the party to change their position would give them an unfair advantage.

Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011); see also New

Hampshire v. Maine, 532 U.S. at 750-51. The Tenth Circuit applies the doctrine "both

narrowly and cautiously." Hansen, 641 F.3d at 1227.

Our rationale behind our cautious application of the doctrine is that judicial

estoppel is a powerful weapon to employ against a party seeking to vindicate its rights,

and there are often lesser weapons that can keep alleged inconsistent statements in check

while preserving a party's option to have its day in court. See Bradford, 516 F.3d at 1194

("Because of the harsh results attendant with precluding a party from asserting a position

that would normally be available to the party, judicial estoppel must be applied with

caution."). The most obvious of these lesser remedies is to allow the opposing party to

impeach at trial the party that has made the inconsistent statement. Judicial estoppel is

only appropriate when that technique or other less forceful remedies are inadequate to

protect the integrity of the judicial system. See Bradford, 516 F.3d at 1194 ("The

doctrine of judicial estoppel is based upon protecting the integrity of the judicial

system . . . .").

11

## II.     Standard of review

The district court held that VMR was judicially estopped on summary judgment, so this court views all facts and reasonable inferences therefrom most favorably to VMR, the non-moving party. Eastman v. Union Pac. R. Co., 493 F.3d 1151, 1155-56 (10th Cir. 2007) (evaluating a grant of summary judgment on judicial estoppel grounds). However, if the district court "properly characterized the facts in light of the applicable standard, we then review its decision to judicially estop [a party] . . . only for an abuse of discretion." Id. at 1156. "A court abuses its discretion only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." Id. (internal quotation marks omitted). In reviewing the district court's decision in this diversity case, this court applies federal principles because the purpose of judicial estoppel is to protect the federal judicial process. Id.

## III.    Neither Mr. Tagliapietra's act of bringing his 2009 action nor his 2011 testimony in that action was clearly inconsistent with his valuation of his VMR stock at 0.00 in 2005

The overarching problem for Mitchell in this case, and the reason we reverse the district court, is the lack of proof that there is a clearly stated change in position between Mr. Tagliapietra's personal bankruptcy and VMR's later litigation. We look at whether judicial estoppel should be applied with a strict eye and, as we explain below, Mitchell has not met its burden to show proof of any such inconsistent statement.

12

Here, Mr. Tagliapietra's initial statement in his bankruptcy filing, of course, was that his VMR stock was worth "0.00." The later allegedly inconsistent statements made in the lawsuit by VMR were:

1) The claim in VMR's lawsuit against Mitchell that Mitchell breached VMR's contract rights and tort rights, and that VMR should receive royalties "at a rate of $1.00 per transaction . . . until the total of payments to VMR equals $4.5 million." (R. Vol. I at 29.)

2) The deposition testimony by Mr. Tagliapietra in VMR's lawsuit that "the statement that 'Mitchell owes VMR,' let's say, 'up to $4 million in royalties'" was "an accurate statement." (R. Vol. I at 234.)

3) The deposition testimony by Mr. Tagliapietra that the Pre-Existing Materials had "[f]our million dollars' worth" of value in 2011 and existed at least back to the time of the 2005 bankruptcy filings. (R. Vol. I at 234-35.)

The reason we reverse is that those statements are not sufficiently clearly inconsistent with the bankruptcy valuation by Mr. Tagliapietra of the VMR stock at 0.00 to trigger judicial estoppel:

1) Both the amount alleged in the complaint against Mitchell, "until the total of payments to VMR equals $4.5 million," (R. Vol. I at 29,) and Mr. Tagliapietra's deposition statement in the Mitchell litigation about the royalties and Pre-Existing

13

Materials' value were opinions, not assertions of verifiable fact.[4] An opinion about a value may often sound decisive, but it may be just an opinion, or even a wish about what might happen. We will not treat such opinions in the same way we treat factually inconsistent assertions designed to work a fraud on the court.

2) Mitchell also points to the deposition testimony by Mr. Tagliapietra in VMR's lawsuit that "the statement that 'Mitchell owes VMR,' let's say, 'up to $4 million in royalties'" was "an accurate statement" (emphasis added). This statement could reasonably mean only that the royalties could not exceed $4 million, i.e. it could be interpreted as a statement of limitation. Thus, it is not a clear declarative statement of the minimum royalties to which VMR was entitled, i.e., it is not a statement of inclusion.

3) Finally, Mr. Tagliapietra's statement about the Pre-Existing Materials' value does not necessarily correlate to the value of the VMR stock (the same goes for Mr. Tagliapietra's statement about the possible royalty value in 2), above). The deposition testimony about the Pre-Existing Materials, in relevant part, was as

---

[4] The assertion in the complaint was not even made by Mr. Tagliapietra—it was made by counsel in an unverified complaint. (See R. Vol. I at 29-30). That the complaint was not verified further weakens Mitchell's case. See Barker v. Citigroup, Inc., 2:11-CV-51, 2012 WL 1379308 (D. Utah Apr. 20, 2012). Barker declined to apply judicial estoppel where the plaintiff's position asserted in an earlier state court case in an unverified complaint had changed as a result of discovery so that the earlier court never adopted the position in plaintiff's complaint. Id. at *2-4.The court stated, "[h]ad the complaint in fact been verified with a sworn factual statement that the check at issue was a forgery, the legal analysis under judicial estoppel would have been different." Id. at *3 n.2.

14

follows:

[BY MR. SCHUTTE:]
Q          Do you think those preexisting materials have any value?
MS. KANE [ATTORNEY FOR MR. TAGLIAPIETRA/VMR]: It's a yes-
          or-no question.
THE WITNESS [MR. TAGLIAPIETRA]: Yes, they have value.
BY MR. SCHUTTE:
Q          What value do they have? I'm not asking for a dollar number.
          I'm asking for –
[BY MR. TAGLIAPIETRA:]
A          Four million dollars' worth.
Q          Okay. And you were entitled, according to your interpretation
          of the contract, the-the- the—excuse me—the preexisting
          materials, all the way back in 1998. Correct?
MS. KANE:  Object to form.
THE WITNESS [MR. TAGLIAPIETRA]: Those preexisting materials
          existed in 1996 and 1997.

(R. Vol. I at 234-35.)

The district court characterized VMR's theory in its 2009 lawsuit as one in which

Mitchell owed VMR royalties "based on the value of VMR's preexisting materials,

materials that existed at the time the contract was entered into." (R. Vol. II at 553.) From

this portrayal, the district court concluded that VMR's lawsuit must have been asserting

that the Pre-Existing Materials, in existence at the time of Mr. Tagliapietra's bankruptcy

petition, had a value greater than 0.00 on the date of petition. From this conclusion, the

district court determined that the VMR stock must have had a value of greater than 0.00

at the time of Tagliapietra's bankruptcy petition in 2005.

We conclude, however, that by presenting that testimony, Mitchell has not met its

burden of showing that Mr. Tagliapietra stated definitively that the Pre-Existing Materials

15

had a value of $4 million—or any other value—in 2005 when Mr. Tagliapietra's personal bankruptcy was filed. In that 2011 testimony, rather, Mr. Tagliapietra acknowledged that the Pre-Existing Materials existed in those early years, but the question from counsel about value was "[w]hat value do they have?"—a question posed in the present tense. (R. Vol. I at 234. (emphasis added)) That Mr. Tagliapietra later volunteered that "[t]hose preexisting materials existed in 1996 and 1997," (id. at 235), was a statement about the existence of the materials. The statement did not clearly express that the materials were worth more than 0.00 in 2005.

More fundamentally, any alleged value of the Pre-Existing Materials in 2005 (or in 2009 or later) could be offset by equally significant costs incurred in bringing necessary litigation to unlock that value, or by other offsets, counterclaims, and similar considerations. Thus, Mr. Tagliapietra could consistently state both that the Pre-Existing Materials had value but that VMR the corporation did not, because he might have been sufficiently unsure about the possibility of realizing any return on that asset in 2005.[5]

The district court thus erred twice in this case on each of these pieces of evidence brought forward by Mitchell. First, the district court's interpretation of Mr. Tagliapietra's

---

[5] For this reason, the debtor's clearly inaccurate valuation of the pre-petition stock in his closely held corporation in In re Bishop, No. 03-80636-JJR, 2009 WL 348844 at *1-2 (Bankr. N.D. Ala. Feb. 6, 2009), relied on by both Mitchell and the district court, is inapposite. The district court's reliance on In re Engel, 246 B.R. 784, 790 (Bankr. M.D. Pa. 2000) fails for the same reason. There is a difference between a clear misvaluation of stock that has a known asset underlying it and a stock with an uncertain inchoate claim underlying it.

16

claim and his testimony required the district court to make an inference against the non-movant, here VMR/Mr. Tagliapietra, which violates the summary judgment standard. As we explained, a plausible inference the other way was possible about each piece of evidence relied upon. Second, to conclude that VMR's 2009 lawsuit or Mr. Tagliapietra's testimony in that lawsuit was clearly inconsistent with Mr. Tagliapietra's bankruptcy valuation of 0.00 in 2005, the district court applied a punishing version of judicial estoppel. But, as we explained, in this circuit, judicial estoppel only applies when "a party takes a position clearly inconsistent with an earlier-taken position." Hansen, 641 F.3d at 1227. It is to be applied "both narrowly and cautiously," id., "[b]ecause of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party." Bradford, 516 F.3d at 1194. Mitchell has not satisfied its burden.[6]

**IV.    Mitchell did not meet its burden of establishing judicial estoppel based on a claim that Mr. Tagliapietra had a continuing duty in the bankruptcy proceeding to update his valuation of the VMR stock as a result of his later conclusions that the preexisting materials had significant value.**

In the district court's "Memorandum and Order responding to Plaintiff's Motion to Alter or Amend a Judgment," "[t]he Court explained that the stock was an asset that

---

[6] Although we focus on the first prong of judicial estoppel, the latter two prongs—"(2) adopting the later, inconsistent, position would create an impression that either the earlier or the later court was misled; and (3) allowing the party to change their position would give them an unfair advantage," Hansen, 641 F.3d at 1227—support our conclusion that judicial estoppel is not appropriate here.

existed pre-petition, unlike the cause of action in this case, so Mr. Tagliapietra had a continuing duty to disclose its true value." (R. Vol. II at 581.) Mitchell claims that Mr. Tagliapietra certainly knew that the Pre-Existing Materials were worth something more than 0.00 by the time the complaint was filed in October 2009, and that Mr. Tagliapietra had a continuing duty to disclose the stock's value. Thus, Mitchell contends, VMR should be judicially estopped based on the inconsistency between Mr. Tagliapietra's failure to update the bankruptcy court about the 2009 stock appreciation and VMR's assertions, as those described above, in the present litigation.

It appears to be a minority view that in a bankruptcy proceeding, debtors have a continuing duty to disclose changes in an asset's value. But we need not reach the question because we can look again to the principles governing this case: judicial estoppel is to be applied cautiously and the party bringing the affirmative defense has the burden to show the court the specific clearly inconsistent statement. Keeping these principles in mind, we hold that for judicial estoppel purposes, Mitchell did not meet its burden to show that VMR's claim and beliefs about that claim—which existed even late in Mr. Tagliapietra's bankruptcy—meant that VMR was taking a clearly inconsistent position from Mr. Tagliapietra's position in bankruptcy regarding the value of the VMR stock.

We acknowledge that the near-simultaneous timing between Mr. Tagliapietra's bankruptcy discharge and the filing of this lawsuit is suspicious, and there is some facial incongruity between Mr. Tagliapietra's approving a valuation of "unknown" for his VMR

18

stock given his testimony that he believed at the time he filed the lawsuit that VMR was entitled to "up to $4 million in royalties" because of the legal claim. It is clear that Mr. Tagliapietra had knowledge of some facts, or at least evidence, supporting this lawsuit during the last year of his bankruptcy.

However, as we discussed above, what a person may think a claim is worth is intrinsically non-determinative—it is not as clear-cut as a demonstrably proven fact. For instance, any predicted recovery will be lessened by: 1) how expensive the claim is to realize; 2) whether the claim will actually be satisfied; 3) possible affirmative defenses that preclude prevailing in the suit; and 4) possible offsets to the award. All these contingencies render ambiguous the value of the claim underlying the value of VMR stock, and the opinions about the value of the claim will reasonably evolve over the course of the litigation, as every trial lawyer and trustee knows. Thus, claims and assertion of claims are often not assertions of fact, at least not for purposes of a disfavored remedy like judicial estoppel. Bearing in mind that Mitchell bore the burden of pointing to the specific inconsistent assertion by Mr. Tagliapietra/VMR, and noting that in this case, it was the Trustee who suggested a value of "unknown" on the final schedule of bankruptcy—Mr. Tagliapietra simply approved it, (R. Vol. I at 243)—we conclude that Mitchell did not meet its burden.

Although we need not, and therefore do not, make a ruling on these points, we note that the body of law is not clear with respect to the debtor's duty to amend his bankruptcy schedules about the evolving valuation of existing assets. The one case that

19

suggests that there might be a continuing duty to update is <u>Donaldson, Lufkin & Jenrette Sec. Corp. v. Mathiasen</u>, 207 A.D.2d 280 (N.Y. App. Div. 1994). In <u>Mathiasen</u>, a petition sought to revoke a bankruptcy estate's abandonment of property to the debtor, and the question was whether the debtor had properly scheduled an asset at the time of petition or had later corrected the schedule if initially incorrect. <u>Id.</u> at 281-82. The court held that "[t]he respondent's listing of a 'claim against Donaldson, Lufkin & Jenrette' on his schedule of assets, without further description or indication of value, was too vague to satisfy the requirements for a proper scheduling," and thus the property could not have been abandoned by the bankruptcy estate. <u>Id.</u> at 282. By holding that the debtor's improper initial scheduling, by listing a claim with no description of value, precluded the estate from abandoning the property to the debtor, <u>Mathiasen</u> implied that such poor disclosure should be amended. But <u>Mathiasen</u> itself does not directly speak to the debtor's duty to amend, especially when the asset was properly scheduled initially.[7]

Cases that suggest or imply that such a duty to amend a bankruptcy schedule does not exist are more numerous, however. In <u>Thomas v. Guardsmark, Inc.</u>, No. 02 C 8848, 2005 WL 1629770 (N.D. Ill. July 7, 2005) the defendant Guardsmark contended that the plaintiff, Thomas, was "judicially estopped from pursuing his lawsuit because he did not properly disclose the existence or value of this lawsuit in his bankruptcy filings." <u>Id.</u> at

---

[7] <u>Mathiasen</u> is also only slightly more relevant than the inapposite cases <u>In re Bishop</u>, 2009 WL 348844 at *1-2 and <u>In re Engel</u>, 246 B.R. at 790, because it involves an ambiguous initial valuation of a pre-petition asset, rather than a clearly erroneous valuation.

20

*1. The district court noted that Thomas had disclosed the lawsuit and listed its value as unknown, and rejected defendant's assertion of judicial estoppel, reasoning that "while a representation that the lawsuit ha[d] no value would be inappropriate . . . . [t]here is a distinction between unknown, as opposed to no value." Id. at *2. The court concluded that a valuation of "unknown" was not "intentional wrongdoing [that] is the focus of judicial estoppel," and declined to judicially estop the plaintiff. Id. at *3.

Further, several cases where creditors or trustees petitioned to revoke a bankruptcy estate's abandonment of property to the debtor for improper disclosure of the asset's value imply that there is no duty to amend a bankruptcy schedule to reflect the evolving value of an asset. In In re Johnson, 361 B.R. 903 (Bankr. D. Mont. 9th Cir. 2007), in this context, the court held that disclosure of a class action suit with the sole description "Class Action Suit" and "unknown" value was sufficient to avoid revocation of the abandonment of estate property to the debtor. Id. at 904, 906. The court reasoned that such a disclosure was not misleading and provided the trustee sufficient basis to conduct an investigation. Id. at 909. In another failed attempt to revoke abandonment of estate property to the debtor, In re Adair, 253 B.R. 85 (B.A.P. 9th Cir. 2000) held that a "debtor did not have an ongoing duty to provide the [bankruptcy] trustee with updated information about [a] lawsuit" which could impact the value of that lawsuit. Id. at 90. The court reasoned, "[i]f Congress or the Bankruptcy Rule drafters had intended to impose a broader duty of ongoing disclosure, either could have expressly so provided." Id. The court contrasted the bankruptcy rules to the Federal Rules of Civil Procedure discovery

21

rules, which do require such an ongoing duty, and concluded that "[t]he Trustee bore the burden of acting if he wanted further updated information about the [l]awsuit." Id. at 90-91. Similarly, In re Parson, No. 01-73786-SCS, 2007 WL 3306678 (Bankr. E.D. Va. Nov. 6, 2007) rejected a challenge to an estate's abandonment of property to the debtor— this time real property, rather than a legal claim. Id. at *9. The court concluded that the property was rightfully abandoned though the debtor had provided the trustee with no update of its appreciation in value. Id. The court implied that it was the trustee's responsibility to determine any change in value, stating "[t]he Chapter 7 Trustee had knowledge of the existence of the asset and ample opportunity for due investigation of the nature and value of the Property." Id. Finally, In re Ozer, 208 B.R. 630 (Bankr. E.D.N.Y. 1997) held, in the context of a petition to revoke a bankruptcy estate's abandonment of property to the debtor, that "[s]uch abandonment is irrevocable even if the trustee subsequently discovers that the abandoned asset has a value which is greater than what the trustee initially believed" if the property was initially scheduled correctly for bankruptcy purposes. Id. at 633.

Both Mitchell's brief on appeal and the district court's decision below rely on off-point precedent that we now address. For instance, Mitchell cites In re Batten, 351 B.R. 256, 258-59 (S.D. Ga. 2006) for the proposition that the "duty to disclose property of the estate is a continuing one." However, for support of this proposition, Batten references Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282 (11th Cir. 2002) holding uncontroversially that a debtor who does not disclose pre-petition claims at the time of

22

petition is under a continuing duty to disclose those claims. Id. at 1286 (emphasis added).

It appears that the Batten court may be referencing that continuing duty. Other inapposite

precedent includes In re Midkiff, 342 F.3d 1194 (10th Cir. 2003) (dealing generally with

Chapter 13 bankruptcies that do not have the same distinction between pre- and post-

filing causes of action) and In re Turner, 335 B.R. 755, 761 (Bankr. D.N.M. 2005)

(denying a debtor's discharge for fraudulent pre- and post-filing acts under 11 U.S.C. "§

727(a)(2), which states that a discharge shall be denied if a debtor, with intent to hinder,

delay or defraud, transfers, removes or conceals property of the debtor within one year

before the filing or after filing of the petition" (emphasis added)).[8]

We do not here attempt to establish Tenth Circuit law on the debtor's duty to

update an asset's value during the course of a bankruptcy proceeding. However, it

---

[8] Mitchell's arguments about the requirements of 11 U.S.C. § 541(a)(6) are also not persuasive, because that provision states that "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case" belong to the estate. Id. But the statute imposes no explicit duty on debtors to amend their filings as the valuation of an asset changes. See In re Potter, 228 B.R. 422, 424 (B.A.P. 8th Cir. 1999) (interpreting 11 U.S.C. § 541(a)(6) as requiring that appreciation of a pre-petition asset belonged to the estate, but not discussing the debtor's duty to amend the bankruptcy schedule); see also In re IndyMac Bancorp, Inc., No. 08-bk-21752-BB, 2012 WL 1037481, at *33 (Bankr. C.D. Cal. Mar. 29, 2012) (holding that "the case law makes clear that, when the estate owns an asset such as stock . . . that appreciates in value postpetition, the added value inures to the benefit of the estate," but not discussing the debtor's duty to amend); United States v. Messner, 107 F.3d 1448, 1453 (10th Cir. 1997) (stating that "although, in general, property not owned by a debtor until after the filing of a bankruptcy petition is not includable in the bankruptcy estate, an exception exists for after-acquired property comprised of the proceeds of estate property" but not holding that there is a duty to amend a bankruptcy schedule (citing 11 U.S.C. § 541(a)(6))).

23

appears that the view that a debtor's duty to amend a properly reported schedule with new information about the evolving estimate of value of a litigation claim is a minority view at best. If we are going to weigh in on this issue in this circuit, it should be in a bankruptcy case where the question is whether a discharge of bankruptcy should be granted to a debtor given his failure to amend his schedules, and not in a judicial estoppel case.

Thus, regarding Mitchell's continuing duty to update argument, we merely hold that in the context of an estoppel doctrine that this court must apply cautiously, Mitchell did not meet its burden as an affirmative defense proponent to point to statements or allegations in this lawsuit that were clearly inconsistent with Mr. Tagliapietra's statements to the bankruptcy court. The district court reached too far when it concluded that "Mr. Tagliapietra had a continuing duty to disclose [the VMR stock's] true value." (R. Vol. II at 581.) The district court's reliance on Mr. Tagliapietra's approval of the bankruptcy Trustee's "unknown" valuation of the VMR stock—itself not a strong affirmative statement given the relevant ambiguity in bankruptcy law—applied an overly robust version of judicial estoppel that is incongruent with this court's precedent. See Hansen, 641 F.3d at 1227.

## CONCLUSION

We conclude that Mitchell has pointed to no statements by Mr. Tagliapietra that were clearly inconsistent so as to trigger judicial estoppel. Neither the claim for relief in Mr. Tagliapietra/VMR's 2009 lawsuit nor Mr. Tagliapietra's subsequent testimony in that

24

lawsuit were clearly inconsistent with his valuing his VMR shares at "0.00" in his 2005 bankruptcy petition. Similarly, Mr. Tagliapietra's lawsuit and deposition testimony are not clearly inconsistent with his approval of the Trustee's valuation of "unknown" pertaining to the VMR stock towards the end of the bankruptcy so as to threaten "the integrity of the judicial system." Bradford, 516 F.3d at 1194. Mitchell has failed to carry its burden for judicial estoppel.

We REVERSE the district court's grant of summary judgment on judicial estoppel grounds and remand the case for further proceedings consistent with this opinion.