FILED
United States Court of Appeals
Tenth Circuit

January 3, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

ASARCO, LLC, a Delaware limited
liability company,

      Plaintiff - Appellant,

v.

NORANDA MINING, INC., a
Delaware corporation,

      Defendant - Appellee.

No. 16-4045

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:12-CV-00527-TC)**

---

Gregory Evans (Laura G. Brys of McGuireWoods, LLP, Los Angeles, California;
David C. Reymann and Cheylynn Hayman of Parr, Brown, Gee & Loveless, P.C.,
Salt Lake City, Utah, with him on the briefs), for Plaintiff - Appellant.

Jeffrey C. Corey (Richard J. Angell, Zack L. Winzeler, and Alan S. Mouritsen of
Parsons Behle & Latimer, with him on the brief), Salt Lake City, Utah, for
Defendant - Appellee.

---

Before **KELLY**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

      Plaintiff-Appellant Asarco, LLC appeals from the district court's entry of

summary judgment against it in its contribution action against Noranda Mining, Inc., under Section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f) (2012). See Asarco, LLC v. Noranda Mining, Inc. (Noranda), No. 2:12-CV-527-TC-DBP, 2016 WL 1317493 (D. Utah Mar. 31, 2016). The district court held that Asarco was judicially estopped from pursuing its claim because of representations it made to a bankruptcy court concerning its settlement agreement with the EPA for the site in question. Id. at *12, *16. It also found, as a matter of law, that Asarco could not establish that it paid more than its fair share of costs for the site. Id. at *15–16. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand.

Background

A.    Asarco's Settlement Agreement and Reorganization Plan

Asarco is an integrated mining, smelting, and refining company that filed for Chapter 11 bankruptcy in August 2005. Because of its long history of mining in the United States, it had the "dubious distinction" of having the largest amount of environmental claims brought against it in any bankruptcy proceeding, totaling approximately $6.5 billion of non-duplicated proofs of claim. In re ASARCO LLC (Asarco I), No. 05-21207, 2009 WL 8176641, at *3–4 (Bankr. S.D. Tex. June 5, 2009). In 2009, after years of negotiations and hearings, the bankruptcy

court approved a comprehensive settlement agreement, by which Asarco agreed to pay approximately $1.79 billion to resolve environmental claims at 52 sites in 19 states. Id. at *8. Although the agreement was negotiated on a global basis, it was divided into five independent settlement groupings of related sites. Id. The last of these groupings, the Miscellaneous Federal and State Environmental Settlement Agreement ("Miscellaneous Agreement"), settled for a combined $94.6 million. Id. at *9. It contained settlements for 26 sites in 12 states, including the site at issue in this appeal: the Lower Silver Creek / Richardson Flat Site ("Site"). Id. at *1, *54. It settled for $7.4 million. Id. at *54.

In reviewing Asarco's proposed global settlement agreement, the bankruptcy court explained that it was bound by two different legal standards. First, Bankruptcy Rule 9019(a) gave the bankruptcy court discretion to approve a compromise or settlement plan. Id. at *9 (citing Fed. R. Bankr. P. 9019(a)). The court noted that it should approve a settlement when doing so is "fair, equitable, and in the best interests of the estate." Id. at *10 (citation omitted). Under this standard, the court "need not resolve disputed issues but should apprise itself of the relevant facts and law so that it can make an informed and intelligent decision as to the reasonableness of the settlement." Id. (citation omitted).

The second governing legal standard was CERCLA itself. See id. at *36–39. Under CERCLA, the bankruptcy court was tasked with reviewing the settlement agreement to ensure it was "fair, reasonable, and consistent with

- 3 -

CERCLA." Id. at \*37 (citations omitted). The court explained that because CERCLA encourages settlement, and because this proposal was the product of years of arm's-length negotiation between the estate, the DOJ, and the EPA, its review of the settlement proposal was necessarily limited. Instead of reviewing the settlement proposal de novo, its task was to ensure the settlement was procedurally and substantively fair — that it "reflect[ed] a reasonable compromise of the litigation." Id. at \*38 (citation omitted).

Specifically, the court continued, "[t]o be fair to other non-settling responsible parties, a settlement should recover at least an amount 'roughly correlated with[] some acceptable measure of comparative fault,' apportioning liability 'according to rational (if necessarily imprecise) estimates' of fair shares of liability for a given facility." Id. (second alteration in original) (quoting United States v. Cannons Eng'g Corp., 899 F.2d 79, 87 (1st Cir. 1990)). "Although the settlement should have 'some reasonable linkage' to the proportionate share of the settling parties, '[r]easonable linkage' does not mean that the agency must choose 'the best or even the fairest method of apportioning liability.'" Id. (alteration in original) (citation omitted) (quoting United States v. Wallace, 893 F. Supp. 627, 633 (N.D. Tex. 1995)).

To meet these standards, Asarco and the EPA presented the bankruptcy court with evidence that the settlement agreements were fair and equitable, both to the estate and its creditors (i.e., that the estate was not paying out substantially

more than it owed) and under CERCLA (i.e., that the government was recovering enough to meet the public interest in cleanup of the environmental sites and that other Potentially Responsible Parties ("PRPs") would not be saddled with liability far beyond their comparative fault). The bankruptcy court received testimony from 47 witnesses and admitted nearly 1700 exhibits into evidence. Id. at *2.

One of those who offered testimony in support of the settlement was Donald A. Robbins, the recently retired director of environmental services for Asarco. See 1 Aplt. App. 93 ("Robbins Declaration"). Mr. Robbins submitted an 18-page declaration to the bankruptcy court detailing why he thought the global settlement agreement should be approved under Bankruptcy Rule 9019. Regarding the Miscellaneous Agreement, he explained that the federal and state governments' claims for these 26 sites totaled about $220 million, that Asarco estimated the total cost of remediation to range from $54.2 million to $149.5 million, and that the proposed settlement would resolve all the claims for around $95 million. Id. at 95–96, 96 n.3. He also discussed the reasons why either Asarco or the government would be willing to settle for more or less than what each believed the true cost of remediation would be. For example, he noted that there were many uncertainties that generally applied to all of the proposed settlements, including the existence and viability of other PRPs and the possibility that Asarco would be found jointly and severally liable for the full costs of remediation. Id. at 98–99. He concluded: "On the whole, I believe that there is a

- 5 -

reasonable linkage between the settlement reached and ASARCO's fair share of responsibility at all of these sites." Id. at 99.

Mr. Robbins then discussed 23 of the Miscellaneous Agreement sites individually, providing the amount the government initially sought, the range of Asarco's projections of remedial costs, and other issues that might affect Asarco's liability for each site. Id. at 101–10. Regarding the Site at issue, he wrote:

> The Lower Silver Creek/Richardson Flat[] site encompasses two distinct, but related areas: the Richardson Flat[] tailing impoundment and the downstream watershed. The area is close to Park City, Utah. EPA initially sought $607,000 to remediate only the tailings impoundment. In a late filed claim, EPA later sought $46,400,000 in future remedial costs related to the downstream watershed. ASARCO estimated that future remedial costs would range between $3,600,000 and $17,200,000 for [the] tailings impoundment and approximately $22,500,000 for the watershed. The proposed settlement is for $7,400,000. The key issues at the Lower Silver Creek site are:
>
> • Joint and several liability: Whether ASARCO would be liable for 100% of the response costs. I understand that there may be other PRPs associated with this site, and the settlement amount reflects only ASARCO's share of the response costs;
>
> • The volume of contaminated material at the Lower Silver Creek area that needs to be treated and the response plan for treating that material is uncertain; and
>
> • Whether the excusable neglect doctrine applies to the government's late-file[d] claim.

Id. at 103.

The bankruptcy court approved the global settlement on June 5, 2009. Asarco I, 2009 WL 8176641, at *53. As to the bankruptcy standard, the court

found the settlement benefitted the estate because it "eliminat[ed] the need to conduct additional contested hearings as to each of the 52 sites addressed in the Settlement Agreements, avoid[ed] the risk of adverse litigation results . . . , and fix[ed] ASARCO's obligations for past and future, known and unknown environmental liabilities." Id. at *12. As for the environmental standard, the court concluded the settlement was consistent with the aims of CERCLA and fair to the government and other PRPs: "[t]he compromise at any given site generally reflects the litigation risk associated with the inherent difficulty of proving future cleanup costs." Id. at *42. Further, the proposed settlement amounts were "substantively fair because they are roughly correlated with [Asarco's] comparable fault, taking into account the litigation risks and additional factors." Id.

Finally, the bankruptcy court also approved certain reservations of rights by Asarco. First, the settlement agreement itself outlined how (a) the settling governments covenanted not to sue Asarco for liabilities related to the sites, (b) Asarco would receive CERCLA contribution protection against other PRPs for the covered sites, and (c) neither the governments nor Asarco were giving up any claims they might have against non-settling parties related to the sites. See 3 Aplt. App. 408–15. Second, the final Chapter 11 Plan of Reorganization ("Reorganization Plan") expressly reserved any contribution actions reorganized Asarco might have against non-settling PRPs, and then specifically listed the

Richardson Flat site in the Schedule of Preserved Litigation Claims. 6 Aplt. App. 1204. The Reorganization Plan was approved by the federal district court at the bankruptcy court's recommendation in November 2009. In re Asarco LLC (Asarco II), 420 B.R. 314 (S.D. Tex. 2009).

B.      The Site

The Site at issue generally refers to two related areas near Park City, Utah: (1) the Richardson Flat Tailings Impoundment, and (2) Lower Silver Creek. The area has been used since the 1870s for mining operations for lead and silver ore. As part of the process for extracting the ore, the pulverized rock — known as "tailings" and bearing a consistency of sand or powder — was left over. The tailings would wash down Silver Creek and accumulate in the Lower Silver Creek area, covering an area roughly three miles long. See 3 Aplt. App. 557. In 1912, the Richardson Flat Tailings Impoundment was created upstream as a dam and diversion system to catch the tailings for reprocessing. See id. at 555. These tailings at the two related sites caused the environmental contamination now in dispute.

C.      Asarco's Contribution Claim in the District Court

In June 2013, reorganized Asarco filed suit against Noranda seeking contribution under Section 113(f) of CERCLA for monies Asarco paid under the settlement agreement for cleanup costs associated with the Lower Silver Creek / Richardson Flat Site. 1 Aplt. App. 11, 23–30. Specifically, Asarco claimed the

$8.7 million it paid — $7.4 million in principal plus $1.3 million in interest[1] — was more than its fair share of the cleanup costs, and that Noranda, as another PRP, should pay Asarco for its share. 1 Aplt. App. 28–30.

Noranda moved for summary judgment on four grounds: (1) Asarco failed to preserve the contribution claim when it was discharged from bankruptcy; (2) Asarco was judicially estopped from seeking contribution because it represented to the bankruptcy court that it was paying only its fair share of liability for the Site; (3) Noranda was protected by a partial consent decree; and (4) Asarco's claim failed as a matter of law because Asarco could not establish it paid more than its fair share of cleanup costs for the Site.

The district court held that Asarco successfully preserved its contribution claim against Noranda, but that Asarco was judicially estopped from now bringing the claim because of its representations to the bankruptcy court. Noranda, 2016 WL 1317493, at *11, *15. It also held that Asarco could not establish that it paid more than its fair share of costs. Id. at *15–16. This appeal followed.

---

[1] In its briefing, Asarco notes that it also paid an additional $1.7 million in costs related to the Site, in the form of a CERCLA settlement with another PRP, Atlantic Richfield, which settled with United Park City Mines Company on behalf of itself and Asarco. See Aplt. Br. at 12 n.7; Aplt. Reply Br. at 18 n.10, 26–27; see also 6 Aplt. App. 1035–69. Asarco did not seek contribution for this settlement in its Second Amended Complaint against Noranda. See 1 Aplt. App. 29–30.

Discussion

A.     Judicial Estoppel

On summary judgment, we view the facts and make all reasonable inferences in a light most favorable to the nonmovant, Asarco, in determining whether Noranda is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Cillo v. City of Greenwood Vill., 739 F.3d 451, 461 (10th Cir. 2013). We then review the district court's decision to judicially estop Asarco for an abuse of discretion. Eastman v. Union Pac. R.R. Co., 493 F.3d 1151, 1156 (10th Cir. 2007) (citation omitted).

Judicial estoppel is an equitable remedy designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749–50 (2001) (internal quotation marks and citations omitted). The burden falls on the moving party to show the need for its application — a difficult task given "our reluctance to impose the harsh remedy." Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc., 767 F.3d 987, 988 (10th Cir. 2014). Indeed, we recognize the doctrine as a "powerful weapon" to be used only when "less forceful remedies are inadequate," id. at 993, and therefore apply it "both narrowly and cautiously," Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011) (citation omitted).

Three factors typically inform a court's decision to judicially estop a party.

First, a party takes a position that is "clearly inconsistent" with its earlier position. New Hampshire, 532 U.S. at 750 (citations omitted). Second, adopting the later position would create the impression that "either the first or the second court was misled." Id. (citation omitted). And third, allowing the party to change its position would give it "an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 751 (citations omitted); see also Hansen, 641 F.3d at 1227.

Noranda argues, and the district court held, that these factors are met here. In essence, Noranda says, Asarco represented to the bankruptcy court that the $7.4 million settlement was fair both to the government and to the bankruptcy estate because that amount represented only Asarco's proportionate share of liability for the Site. To now allow Asarco to turn around and claim that this amount constituted an overpayment would reward Asarco for effectively "conceal[ing] a multi-million dollar asset from its creditors and the bankruptcy court." Aplee. Br. at 3.

We disagree, and conclude that Noranda has not met its burden of showing that relief is warranted. Therefore, the district court abused its discretion in applying judicial estoppel. See Vehicle Mkt. Research, 767 F.3d at 989, 999–1000. The overall context of the CERCLA settlement approved by the bankruptcy court makes it apparent that Asarco's positions are not clearly inconsistent, that to allow Asarco to pursue its claim would not create the

perception that a court was misled, and that Asarco would not necessarily gain an unfair advantage by being allowed to pursue its claim now. We address each factor in turn.

1.    *Inconsistency of Positions*

The district court found that (1) Asarco told the bankruptcy court its fair share of liability for the Site was $7.4 million; (2) Asarco now claims this amount actually represents more than its allocable share of costs; and (3) it follows that the two statements are "clearly inconsistent." Noranda, 2016 WL 1317493, at *12–13.

The crux of this line of reasoning comes from one sentence in the Robbins Declaration: "I understand that there may be other PRPs associated with this site, and the settlement amount reflects only ASARCO's share of the response costs[.]" 1 Aplt. App. 103.

For its part, Asarco contends this statement, though poorly phrased, was meant to indicate Asarco's belief that the $7.4 million figure represented Asarco's "potential joint and several liability" for the Site. Aplt. Br. at 23. That is, "Robbins was explaining that Asarco's allocable share of the response costs was one of the key uncertain issues that would not be resolved through litigation because the parties decided to settle." Id. at 26. In a deposition, Mr. Robbins testified accordingly — that the $7.4 million figure was for Asarco's "fair joint and several liability share." 7 Aplt. App. 1365.

Noranda says this explanation does not hold up. It argues that, because the EPA's total claim for the Site approximated $50 million, and Asarco's estimations to clean up the Site ranged from $26 million to $40 million, the only way a $7.4 million settlement would make sense is if it were solely for Asarco's apportioned share. Aplee Br. at 42–43. Noranda buttresses this factual argument with a legal one: the bankruptcy court could only approve the settlement if it were correlated to Asarco's "comparative fault"; it could not approve the settlement if Asarco was taking on the entirety of the potential liability. Id. at 47–48.

The latter argument first. Though it is true that a CERCLA settlement should be fair, reasonable, and roughly correlated with the responsible party's comparative fault, see Cannons, 899 F.2d at 87, this guideline does not do away with the contribution provisions of CERCLA itself, see 42 U.S.C. § 9613(f). To encourage PRPs to settle, Congress provided that an entity that has resolved its liability to the government "for some or all of a response action . . . in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement [with the government]." 42 U.S.C. §9613(f)(3)(B); see also Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005). Thus, as the bankruptcy court noted, "nothing in Cannons suggests that a settlement is necessarily unfair if a settling PRP pays more than an amount equivalent to its comparative fault." Asarco I, 2009 WL 8176641, at *43. Were it otherwise, no party would settle before a mini-trial was held to determine its

exact share of environmental liability — and then there would never be need for a contribution action by a settling party. Even acknowledging the tension between Bankruptcy Rule 9019 and CERCLA, we cannot agree that the bankruptcy court would err if it approved a settlement that might have been for more than Asarco's exact share of environmental liability.

As for Noranda's factual argument, the Robbins Declaration shows that Asarco's actual estimate of remedial costs for the Site was $22.5 million for the watershed and between $3.6 million and $17.2 million for the Tailings Impoundment. 1 Aplt. App. 103; see also Asarco I, 2009 WL 8176641, at *54 (bankruptcy court recording approximately $3.6 million as Asarco's low estimate for the Site). But one of the main uncertainties about how much the government's claim was actually worth was whether it would even be allowed to proceed on the late-filed claim for the watershed. Thus, as the EPA explained in its brief to the bankruptcy court in support of the settlement, the $7.4 million settlement for the Site not only "discount[ed] for some uncertainty regarding the nature of Asarco's operations on its leaseholds and the uncertainty of estimating costs when a remedy has not been formally selected," but also "reflect[ed] the litigation risk associated with the timing of the claim amendment for this Site." 1 Aplt. App. at 131.

CERLCA allows a party to settle for an inexact amount and later seek contribution from other PRPs for any amounts it overpaid. Since doing so,

without more, does not equate to pursuing inconsistent positions, the district court's conclusion is inconsistent with the nature of CERCLA claims and of Asarco's underlying settlement.

## 2. *Impression that a Court was Misled*

It follows that neither do we think the second New Hampshire factor has been met. As the Supreme Court explained, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." New Hampshire, 532 U.S. at 750 (internal quotation marks and citation omitted).

Though the parties dispute whether the bankruptcy court's approval of the settlement actually constitutes "sufficient 'judicial acceptance' to estop the party from later advancing an inconsistent position," Noranda, 2016 WL 1317493, at *14 (quoting Reynolds v. Comm'r of Internal Revenue, 861 F.2d 469, 473 (6th Cir. 1988)), we think the simpler inquiry is whether allowing Asarco to proceed with its contribution claim would create the impression that either court was duped — for it is this unfairness with which the equitable doctrine is concerned. We do not think it would. First, as discussed above, this is because we do not think the actual positions by Asarco necessarily conflict. But second, it is because the bankruptcy court itself knew and approved of Asarco's preservation of contribution claims for the sites it settled. This came not only in the form of a

- 15 -

general reservation in the settlement agreement, 3 Aplt. App. 411, but also as a specific reservation of a potential contribution action for the Site in the approved Reorganization Plan, 6 Aplt. App. 1200, 1204.[2]

That is, it is one thing for the bankruptcy court never to be told of assets or potential claims by the debtor and then for the debtor to seek to bring those claims in a different court.  E.g., Eastman, 493 F.3d at 1153.  But it is another thing for the bankruptcy court that approved the settlement to also approve the debtor's reservation of rights with regard to such an asset.  It makes it much less likely that Asarco was "playing 'fast and loose with the courts.'"  Scarano v. Cent. R. Co., 203 F.2d 510, 513 (3d Cir. 1953) (citation omitted).

### 3.    *Unfair Advantage*

Noranda also argues that allowing Asarco to pursue its contribution claim "would reward Asarco for either misleading the bankruptcy court, the district court, or both," Aplee. Br. at 58, and that this is "exactly the type of unfair advantage the judicial estoppel doctrine is intended to prevent."  Id.

Yet the opposite could also be said — that it would be unfair to Asarco to prevent it from pursuing a claim it expressly reserved in bankruptcy.  In Asarco's

---

[2] Specifically, the Reorganization Plan was approved by the federal district court in Texas in November 2009.  Asarco II, 420 B.R. at 357.  It adopted the bankruptcy court's report and recommendation to approve the Parent's (i.e., Asarco Incorporated and Americas Mining Corporation) plan for reorganization of the debtor (Asarco LLC).  Id. at 357–58.  It is this Reorganization Plan that includes the reservation to reorganized Asarco of the potential PRP contribution claims.  6 Aplt. App. 1200–04.

view, it settled the environmental claims with the EPA for inexact amounts because it was relying on the CERCLA framework that allows it to pursue the difference in contribution actions later on.  See 42 U.S.C. § 9613(f).

The specific statement in the Robbins Declaration does not change this. Given the context of the statement — appearing in the middle of an 18-page report on all the sites included in the Miscellaneous Agreement, and regarding a proposed settlement that at $7.4 million comprised less than one percent of the total global settlement of $1.8 billion — and given that Mr. Robbins testified in a deposition that he made a mistake in how he worded the statement, see 7 Aplt. App. 1365, we think it would be unfair to estop Asarco simply because of one ambiguous sentence.

Though it is true that we have generally been unreceptive to "debtors' attempts to recover on claims about which they 'inadvertently or mistakenly' forgot to inform the bankruptcy court," Eastman, 493 F.3d at 1157, this case is easily distinguishable.  In Eastman, for instance, the debtor failed to disclose his pending lawsuit as a potential asset of the estate in his bankruptcy petition.  Id. at 1153.  The district court found, and we affirmed, that the debtor's concealment of this asset from the bankruptcy court was not inadvertent, but planned to mislead the bankruptcy court.  Id. at 1154–55, 1159–60.  Therefore, judicial estoppel was necessary to protect the integrity of the judicial process.  Id.; see also Queen v. TA Operating, LLC, 734 F.3d 1081, 1087–91 (10th Cir. 2013).  Though we do not

- 17 -

say that inadvertent representations can never "count" for judicial estoppel purposes, we do think this case is sufficiently distinct from Eastman to warrant a different result.

B.      Noranda's Consent Decree and Asarco's Bankruptcy Settlement

The district court also held, as a matter of law, that Asarco cannot establish that it paid more than its fair share of costs for the Site or that Noranda would be liable for any part of the difference. Noranda, 2016 WL 1317493, at *15–16. The court provided two reasons for its decision. First, a 2006 consent decree between Noranda and the EPA gave Noranda contribution protection for costs associated with the Tailings Impoundment before March 1, 2006. Id. at *15. Second, the same statements that called for application of the judicial estoppel doctrine, "whether treated as judicial admissions or as undisputed substantive evidence of its pro rata share," definitively established Asarco's liability for the Site. Id. at *16.

First, the consent decree. It is true that Noranda is protected from contribution claims for "matters addressed" in the decree, 6 Aplt. App. 1083, and that those matters include costs incurred by the EPA in connection with the "Richardson Flat Tailings Site" through March 1, 2006, id. at 1078. But it necessarily follows that the consent decree does not protect Noranda from (a) costs associated with the Tailings Site incurred after March 1, 2006, or (b) costs associated with other (if related) sites, such as Lower Silver Creek. So the

- 18 -

question is whether the contribution Asarco seeks falls within one of those two categories and, if so, whether Asarco is legally able to recover those costs from Noranda.

Regarding the timing issue, Noranda argues that because the EPA's first proof of claim sought only $607,000 from Asarco for past response costs at the Richardson Flat Tailings Impoundment, its supplemental proof of claim, which totaled $50 million, was for past and future response costs related only to Lower Silver Creek. Aplee. Br. at 66–68. Indeed, this had to be the case, Noranda says, because by the time of the Asarco-EPA settlement, the EPA had entered into a consent decree with United Park City Mines Company ("UPCM"), another PRP, under which UPCM agreed to finance and carry out the future response costs for the Tailings Impoundment. Id.; see also 4 Aplt. App. 715–68. Thus, according to Noranda, Asarco cannot now seek contribution because UPCM, not Asarco, paid the EPA for any future response costs associated with the Tailings Impoundment. Aplee Br. at 66–68.

The settlement agreement between Asarco and the EPA does not make any such timing distinctions. See 3 Aplt. App. 394–95, 400–01 ("In settlement and full satisfaction of all claims and causes of action of the United States . . . against Debtors with respect to any and all costs of response incurred, or to be incurred, in connection with . . . the Richardson Flat Site . . . ."). Nor does a look back to the EPA's proofs of claim settle the issue. Though the first proof of claim sought

- 19 -

$607,000 from Asarco for "unreimbursed response costs" at Richardson Flat Tailings Impoundment, 5 Aplt. App. 932, the supplemental proof of claim "include[d] the Lower Silver Creek area as part of Richardson Flat," id. at 959. Indeed, the EPA discussed the two areas together "because of the[ir] interconnection." Id. Thus, the claims for the sites were also combined:

> 13. ASARCO is liable to reimburse the United States for the costs . . . of actions taken or to be taken by the United States in response to releases and threatened releases of hazardous substances at Richardson Flat and in the Lower Silver Creek area.

> 14. In addition to the $607,000 asserted in the United States' August 1, 2006 Proof of Claim for Richardson Flat, the United States estimates at this time that its future response costs at Richardson Flat and in the Lower Silver Creek area will total approximately $50 million.

Id. at 960. Further, the Robbins Declaration itself discussed the future remedial costs for the Tailings Impoundment: "ASARCO estimated that future remedial costs would range between $3,600,000 and $17,200,000 for [the] tailings impoundment and approximately $22,500,000 for the watershed." 1 Aplt. App. 103.

Noranda's geographical argument is similarly unavailing. In its Complaint, Asarco sought contribution from Noranda "for its equitable share in contribution to Asarco's Richardson Flat[] Site Government Settlement." 1 Aplt. App. 30. Asarco described that site as including, "[i]n addition to the tailings impoundment, . . . the Ontario #3 mine, the Keetley Drain Tunnel, portions of the Lower Silver Creek Area, a slurry line, and other associated mine workings." Id.

- 20 -

at 26. Thus, by its terms the Complaint seeks relief for costs associated with sites outside of the area Noranda settled. We disagree that either Noranda's or Asarco's settlement agreements foreclose Asarco's claim as a matter of law.

Second, for the same reasons we do not think Asarco's position before the bankruptcy court warrants judicial estoppel, neither do we agree that Asarco's representations constitute undisputed substantive evidence of its exact share or a judicial admission of liability.[3] At the summary judgment stage, the evidence must be viewed in a light most favorable to Asarco, and Asarco has presented evidence to dispute Noranda's interpretation of the Robbins Declaration on this point. Therefore, we find that Asarco has raised a genuine issue of material fact and that it should be able to present evidence as to (1) why it believes it paid for post-2006 costs related to the Richardson Flat Tailings Impoundment, and (2) why at least some of those costs, and any other costs for Lower Silver Creek and

---

[3] "Judicial admissions are 'formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute.'" U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005) (quoting Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo. 1986)). True judicial admissions are binding in the entirety of the case in which they were made. In contrast, "ordinary evidentiary admissions" can be controverted or explained by a party, and such admissions include "pleadings in another case, superseded or withdrawn pleadings in the same case, [and] judicial admissions in another case." 30B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7026 (Kenneth W. Graham, Jr. & Michael H. Graham eds., 4th ed. 2014) (collecting cases). Thus, even assuming Mr. Robbins's statement to the bankruptcy court was a judicial admission in that case, it would only be an evidentiary admission in this one.

related sites, should be borne by Noranda.

We therefore REVERSE the district court's grant of summary judgment and REMAND the case for proceedings consistent with this opinion.